No. 106,273

STATE OF KANSAS, *Appellee*, v. SHARON HUDDLESTON, *Appellant*.
(318 P.3d 140)

Opinion filed February 14, 2014.

*Meryl Carver-Allmond*, of Capital Appellate Defender Office, argued the cause and was on the brief for appellant.

*Boyd K. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: In this direct appeal, Sharon Huddleston presents two arguments for reversing her conviction of premeditated first-

degree murder. We reject both arguments. As to her first issue, although we agree the two prosecutors who made arguments to the jury misstated the law by suggesting premeditation could occur after a homicidal act, we conclude it is not reasonably probable that these misstatements affected the outcome of the trial given the strong evidence of premeditation, the jury instructions, and the prosecutors' correct statements of the law regarding premeditation. As to the second issue, we hold the trial judge did not err when he admitted into evidence two jailhouse letters written by Huddleston because the letters were relevant and reasonable people could agree with the trial judge's assessment that their probative value outweighed any potential prejudicial impact.

### FACTS AND PROCEDURAL BACKGROUND

Huddleston's conviction for premeditated first-degree murder arose from the death of Todd Stover in 2000. No charges were brought in the case for over 10 years.

In May 2000, Stover's body was found in a ditch by the side of a dirt road in Greenwood County. Because of decomposition, Stover's face was unrecognizable, but forensic scientists were able to identify him by his fingerprints. At that time, the Kansas Bureau of Investigation (KBI) was assigned to the case. The KBI discovered that Stover's family had last seen him approximately 13 days earlier and that Stover had been picked up from an apartment in Wichita around May 25, 2000, between 9 and 10 a.m. by three women in a tan, four-door sedan. The only name the KBI developed was "Rhonda," who was possibly living in the Park City area. These leads were insufficient to produce a suspect or suspects at that time.

The investigation became dormant and remained so for many years until, in March 2010, law enforcement officers in Carthage, Missouri, contacted the Park City Police Department and reported that a woman named Sharon Edwards had information regarding a 10-year-old murder involving Sharon Huddleston and Rhonda Pischel. Upon looking for unsolved murders in the area, a Park City police officer came across the case involving Stover in Green-

wood County. The officer contacted the KBI for assistance, and Edwards, Huddleston, and Pischel were located and interviewed.

At the time of Stover's death in 2000, Huddleston and Edwards had been domestic partners who lived in Park City with Pischel, Huddleston's sister. The three women had been acquainted with Stover through his friendship with Pischel. In the years between Stover's death in 2000 and Edwards' report to law enforcement in 2010, the three women had moved to separate residences.

Officers first interviewed Huddleston on May 27, 2010. She acknowledged she had been in a relationship with Edwards in 2000, but she denied knowing Stover. When the officers showed her a photograph of Stover, Huddleston said she did not recognize him. At one point in the interview, however, Huddleston said her sister, Pischel, had been "involved" with a tall, skinny man with a ponytail. These details matched the general description of Stover's body as it was discovered in 2000. According to Huddleston, Pischel's friend had spent one night at the Park City house and "they" had driven him back to an apartment in Wichita the next day.

On June 24, 2010, officers conducted a second interview with Huddleston at her residence. This time she admitted that she had known Stover and that he had promised to get her a job. Huddleston explained that she got angry because she had spent money on Stover but he did not actually have the resources to get her a job. Huddleston felt Stover was "conning her out of money," which made her feel stupid. She told Edwards that she "wanted to kill that son of a bitch." Edwards, who was diabetic, suggested that Huddleston could kill him by giving him a shot of insulin. Huddleston indicated she considered Edwards' plan for a couple of days. At another point in the interview, Huddleston also mentioned Stover's alleged mistreatment of a disabled veteran at a Wichita bar. She told officers that she felt like a "vigilante," paying Stover back for the way he treated the veteran.

According to Huddleston's statement, on a May morning in 2000, the three women—Huddleston, Edwards, and Pischel—drove Edwards' tan 2000 Mitsubishi Diamante sedan to an apartment in Wichita where Stover was staying. When they arrived, Huddleston looked into the apartment window and saw Stover

sleeping on the floor. They roused him, and the foursome got into the car and drove back to the Park City house. When they arrived, Huddleston and the others got drunk and used cocaine.

Around 2 or 2:30 p.m., Huddleston injected insulin twice into Stover's back as he walked from the kitchen into the living room. Huddleston indicated that each injection contained half a bottle of insulin or 50 units; thus, Stover received approximately 100 units of insulin. When Huddleston first injected Stover, he turned to her and said, "[Y]ou just gave me a shot of insulin." Huddleston told him, "[N]o, it was Valium." She told Stover to go lie down and that he would be okay.

The insulin overdose caused a long, drawn-out death. Shortly after the injections, Stover lay down in one of the bedrooms. Around 6 p.m., Edwards left for work. By that time, Stover was having trouble breathing and was sweating, so Huddleston and Pischel decided to move him to a couch in the garage. Huddleston revealed that at some point after taking Stover to the garage, they tried to counteract his low blood sugar level by attempting to put "sugar water" into his veins, but this technique did not work. Huddleston went to rest in her bedroom while Pischel stayed with Stover for a while, holding his head and combing his hair. Eventually Pischel also left Stover and went to sleep. Around 11 p.m., Pischel woke up and, upon looking into the garage, saw that Stover was not breathing. She woke up Huddleston, and they went into the garage together.

Huddleston determined Stover was dead. She explained to the officers that she had training and experience as a nurse's aide and, therefore, was able to make the determination of death. She also indicated that because of her training and experience she knew the effects of insulin on a nondiabetic person and knew it would eventually cause the heart to stop. But at various points during her interview, Huddleston also said she "didn't mean to kill him," she "just wanted to knock his ass out," and she merely wanted to "mess him up." At other times she equivocated by stating, "I didn't think it would really kill him. In a way I did and in a way I didn't."

Recounting what happened after Huddleston determined Stover was dead, Huddleston told the officers she drove her pickup truck

to Edwards' place of employment and traded vehicles with her. Huddleston then drove the tan Diamante back home, where she and Pischel loaded Stover's body into the trunk and covered it with a blanket, planning to dump the body into Grand Lake in Oklahoma. On their journey, the body started to have a foul odor. They decided to stop and dispose of the body in a field, but when they got the body out of the trunk, it was too heavy for them to carry. So Huddleston and Pischel left the body in a ditch near the road. They took the blanket with them on their drive back to Wichita and disposed of it in a construction-site dumpster. Huddleston also power washed the vehicle's trunk.

Huddleston admitted to law enforcement officers that she had told her daughter and another sister about the incident. Through more investigation, the officers learned that Huddleston had also told another individual, Albert Greenly, about the incident and had pointed out to him the location where she had dumped the body.

At trial, Huddleston's statements were admitted into evidence. In addition, over defense counsel's objections, the court admitted two jailhouse letters written by Huddleston to Pischel. We will discuss the contents of the letters in more detail, but both letters implicated Huddleston in the events surrounding Stover's death and attempted to shift guilt from her to Sharon Edwards. For example, in one letter Huddleston said, "I'm going to blame everything on Sharon E. thats [sic] who I think did it. You woke me up and we were scared thats [sic] why we did what we did. But Sharon Edwards gave the shot and I took the blame. Please keep to that story." In the other letter, Huddleston told her sister, "We need to make it look like Sharon E. gave the shot to him."

The State also called the chief medical examiner as a witness. She informed the jury that 100 units of insulin would cause a nondiabetic person's blood-sugar level to dip down to a low level "that's not compatible with life." She further explained that "[p]rofoundly low levels of blood sugar" will "cause your brain and other organs to shut down, especially your brain. Your brain essentially runs on sugar. And if you don't have any, then your brain is not going to work and you will go into a coma, possibly have seizures, and die."

Based on this evidence, a jury convicted Huddleston of the premeditated first-degree murder of Stover, in violation of K.S.A. 21-3401(a). The court sentenced Huddleston to life imprisonment without the possibility of parole for 25 years. Huddleston filed this timely appeal, over which this court has jurisdiction under K.S.A. 22-3601(b)(1) (maximum sentence of life imprisonment imposed).

## PROSECUTORIAL MISCONDUCT NOT REVERSIBLE

First, Huddleston argues that the prosecution committed misconduct during closing argument by misstating the law regarding premeditation and thereby depriving her of a fair trial.

In discussing the standard of review for this issue, Huddleston indicates that "[t]his court has put forth two similar, but different, tests for when a misstatement of law by a prosecutor denies a defendant a fair trial." For the first test, Huddleston cites a 2002 decision in which this court stated: "A misstatement of the law, whether by prosecutor or by the court, denies the defendant a fair trial where the facts are such that the jury could have been confused or misled by the misstatement." *State v. Henry*, 273 Kan. 608, 619, 44 P.3d 466 (2002); see *State v. Moncla*, 262 Kan. 58, 69-70, 936 P.2d 727 (1997). Second, Huddleston refers to what she labels "the traditional prosecutorial misconduct analysis." See *State v. Tosh*, 278 Kan. 83, 93, 91 P.3d 1204 (2004).

Recently, we summarized the *Tosh* test, indicating:

"We have said that review of prosecutorial misconduct claims involves a two-step process. The court first decides whether the comments were outside the wide latitude a prosecutor is allowed, *e.g.*, in discussing the evidence. If so, there was misconduct. Second, if misconduct is found, we have said the court must determine whether the improper comments prejudiced the jury and denied the defendant a fair trial. *State v. Marshall*, 294 Kan. 850, 856, 281 P.3d 1112 (2012).

"For years [since the *Tosh* decision in 2004] we have considered several factors in analyzing this second step: (1) whether the misconduct was gross and flagrant; (2) whether it was motivated by prosecutorial ill will; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors has been individually controlling. *Marshall*, 294 Kan. at 857.

"Since 2004, this court has also demanded that any prosecutorial misconduct error meet the 'dual standard' of both constitutional harmlessness and statutory harmlessness to uphold a conviction. See *State v. Tosh*, 278 Kan. 83, 97, 91 P.3d

1204 (2004) (Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 [1967], have been met.).

"Under the constitutional harmless error analysis defined in *Chapman*,

'the error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

"Under the harmless error analysis defined in K.S.A. 60-261, the test is equally clear. The court 'determine[s] if there is a reasonable probability that the error did or will affect the outcome of the trial in light of the entire record.' 292 Kan. 541, Syl. ¶ 6.

"Under both standards, the party benefiting from the error—here, admittedly the State—bears the burden of demonstrating harmlessness. *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013). That burden is higher when the error is of constitutional magnitude. See *Herbel*, 296 Kan. at 1110 ('Clearly, the party benefiting from the constitutional error must meet a higher standard to show harmlessness than the standard required in nonconstitutional error.')." *State v. Bridges*, 297 Kan. 989, 1012-13, 306 P.3d 244 (2013).

Even though we have applied this dual standard, we also have observed that as a practical matter the result of the harmless error evaluation depends on the outcome of the constitutional standard. We noted that "both the constitutional and nonconstitutional error clearly arise from the very same acts and omissions" and the constitutional standard is more rigorous, meaning the State necessarily meets the lower statutory standard under K.S.A. 60-261 if it meets the higher constitutional standard. *Bridges*, 297 Kan. at 1015 (citing *State v. Herbel*, 296 Kan. 1101, 1111, 299 P.3d 292 [2013]).

As this discussion indicates, the 2004 decision in *Tosh* modified our standard of review. This modification reduced the precedential value of pre-2004 decisions, including the cases cited by Huddleston—*Henry*, 273 Kan. at 619, and *Moncla*, 262 Kan. at 69-70. The continued viability, if any, of a pre-2004 decision must be evaluated by determining whether it is consistent with the *Tosh* test. Making that comparison, it seems that the *Henry* test of whether a prosecutor's comments misled the jury would appropriately and neces-

sarily be a part of the determination of whether the harmless error standard had been met, *i.e.*, of whether the party benefitting from the error proved beyond a reasonable doubt that the error complained of did not affect the outcome of the trial. In fact, the full discussion in both *Henry* and *Moncla* reflects that framework. See *Henry*, 273 Kan. at 620 (indicating effect of misstatements must be considered in light of court's instructions to the jury and other error); *Moncla*, 262 Kan. at 69-70 (applying constitutional harmless error standard).

Hence, we apply the *Tosh* standard as our standard of review and consider whether the statements would have misled the jury in the context of our harmless error analysis.

### Prosecution's Comments

Two prosecutors actively participated in the jury trial. When it came time for the closing arguments, the prosecution reserved its right to present a rebuttal argument after the defense argument. One prosecutor presented the first argument, and the second presented the rebuttal. Huddleston argues both of the prosecutors misstated the law during these arguments by stating that premeditation can occur *after* the killing. In talking to the jury about premeditation, the first prosecutor began by correctly explaining premeditation:

"Let's talk about premeditation. This is the instruction for premeditation and there's a lot of words up there. Basically premeditation means to have thought over the matter beforehand and requires more than an instantaneous intentional act. Well, did [Huddleston] think about it before hand[?] She has a conversation with Sharon Edwards about killing [Stover]. She says I thought about it for a couple of days. And they knew, they being Sharon Edwards and Rhonda Pischel, knew that she was going to do it.

"Did she think about it? You bet. That requires more than an instantaneous, intentional act. That conduct is not instantaneous. It's opportunistic. It's not in the heat of the moment. It's planned. That conduct is not the product of an instantaneous, intentional act. No way."

But later the first prosecutor made statements that Huddleston claims fall outside the law on premeditation:

"In looking at premeditation, let's consider the acts that occurred before, during, and after the actual stabbing. Before. [Huddleston's] upset she doesn't get a

job. She talks it over with Sharon Edwards, she thinks about it for a couple of days, and Edwards and [Pischel] are made aware of the acts that Ms. Huddleston is going to take to rectify the situation. They get in their car and they go pick [Stover] up. They go to the apartment and they peek in the window. Yeah, he's there. Let's take him back to our house. And she waits until the opportunity presents itself when his back is turned.

"Let's talk about during. The act of deliberately drawing up two separate shots of insulin. She tells him it's Valium. Go [lie] down. She, in fact, goes and [lies] downs herself. What is she thinking? She's thinking, go [lie] down, you're going to die. I don't care. I'm going to [lie down]. And when she is made aware that he's sweating, that he's having trouble breathing, what do they do? They take him out to the garage. *That's premeditation.* They never call 911, never call police, EMS, never take him to a hospital. Nothing. They don't do a darn thing that they know would significantly increase his chances of living. In fact, for five hours they watch. *That's premeditation.*

"Afterwards what do they do? They wrap him and put him in a blanket, they load his body in a trunk, and they head out to Grand Lake. Why? Because they have a plan. The same plan that's been discussed, the same plan that they talked about, the same plan that they knew what was going to happen when they killed Todd Stover.

"They planned to be smart about it. They stop on a rural gravel road after he starts to stink, after Ms. Huddleston says I thought his pancreas burst. She had nurse's training, she knew what insulin would do. They get rid of the blanket, they clean out the car. She's trying to be smart about it. *That's premeditation.*

"Let's talk about those letters. I'm going to blame everything on Sharon E. *Premeditation after the event.* Sharon Edwards gave the shot and I took the blame. There's been no evidence that Sharon Edwards gave the shot. None. *Premeditation after the event.* We need to make it look like Sharon Edwards gave the shot. Excuse me, that Sharon E. gave the shot. She's conscious of her own guilt. *Premeditation.* Conduct. Oh, and by the way, one more thing about Edwards. Didn't we go to get the car at Leonine? [That is the address where Edwards worked.] We went to Leonine to go get that car, didn't we? Yeah, that's how it happened. Remember, she backed the Mitsubishi up into the garage before she rolled him up in a blanket, before they loaded the body in the trunk, before they started to head out to Grand Lake.

. . . .

"Requires more than an instantaneous, intentional act. That conduct is not instantaneous. Nothing about that is instantaneous. It was opportunistic. And that conduct lasts nine hours. Nine hours. Five of which [Stover] spends in a garage when they drag his body from the bedroom where she told him to [lie] down and they take him out into the garage. So did she kill with premeditation? Yes. Sharon K. Huddleston killed Todd Stover with premeditation." (Emphasis added.)

Toward the conclusion of the State's argument, the first prosecutor reiterated: "And *it was premeditated.* Planned, discussed,

thought about, talked about, acted on. For nine hours [Stover] suffered. Sweat, he was breathing funny, dragged out from the bedroom into a garage. They comb his hair and watch him die for five hours. *That is premeditation.*" (Emphasis added.)

Defense counsel then began his closing argument by emphasizing the definition of premeditation, stating:

"Premeditation means to have thought the matter over beforehand. We talked during voir dire about the instructions, how the Judge would tell you what the law was, and that you would have to follow it. . . .

"Instruction No. 6 in the packet that you guys will get talks about premeditation. It says that it means to have thought over the matter beforehand. In other words, to have formed the design or the intent to kill before the act. Okay. Before the act. So the discussion about premeditation happening before, during, and somehow after the fact is contrary to the law."

Defense counsel was interrupted by an objection. The judge ruled on the objection by advising counsel to "frame your argument with the instructions as given." This comment drew the jury's attention to the instructions, which defense counsel reinforced by stating:

"The instruction, premeditation, to have thought the matter over beforehand, to form the design or intent to kill before the act.

"It's tough to tell what someone is thinking beforehand. But, nevertheless, in a case like this you're asked to crawl around inside someone's head, determine what they were thinking. You're asked to look at their actions beforehand and say is this what they intended to do. Is this what they thought was going to happen. Because that's what premeditation is, to think it over beforehand, to plan to do the act ahead of time."

In the State's closing rebuttal argument, the second prosecutor stated the following about premeditation:

"This idea about premeditation, yes, premeditation is determined—you have to determine that she premeditated it—this as an act. It was a premeditation for the death. But the idea about before, during, and after is there are things that happened afterward that indicate that, yes, she had a premeditation before. Right.

"Not that these acts were—that they happened after premeditated acts. But that the acts and the evidence that you heard about what she did before, during, and after are things that show, yeah, she meant to kill him and she planned to kill him beforehand. That's how you consider all the evidence in this case.

. . . .

"She didn't want [Stover] at the house but yet, again, to show premeditation, she, [Pischel], and Sharon Edwards, all three of them, who, like she said, knew she was going to do it, they all three go pick him up at a place where he was doing whatever he was doing, not bothering them at all, for the purpose of bringing him back to inject this insulin. That's a reasonable, common sense assessment of that information. Besides she said she thought about it for a couple of days. *Premeditation.*

. . . .

"And then what do you think about her intention and *her premeditation was going on all those nine hours,* like my [co]counsel said? What's going on in her head besides watching TV and taking a nap? She's just waiting for [Stover] to do what she wanted to happen in the first place, die. Not come out of it." (Emphasis added.)

Huddleston argues that any acts occurring *after* the insulin injections—the act that brought about Stover's death—should not have been characterized by the prosecution as acts of premeditation. Huddleston states the following in her appellate brief:

"Here, it was undisputed that the act at issue was injecting Mr. Stover with insulin. Thus, only Ms. Huddleston's intent and thoughts before that act constitute premeditation. Everything else—leaving Mr. Stover to sleep, taking him to the garage, leaving his body by the side of the road—is not legally premeditation. And certainly two letters, written ten years after the fact, are not premeditation."

According to Huddleston, the prosecutors' remarks confused and misled the jury to believe that all the acts which occurred before *and* after the injections—the homicidal act that cause Stover's death—constituted premeditation.

*Step 1: Misconduct*

To consider whether the prosecutors misstated the law regarding premeditation it is helpful to review Kansas law regarding the meaning of the term. A definition can be found in PIK Crim. 3d 56.04(b), which states: "Premeditation means to have thought over the matter beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life." See *State v. Jamison,* 269 Kan. 564, 573, 7 P.3d 1204 (2000). The jury instructions in this case comported with this def-

inition, and the jury was reminded of this definition during the closing arguments of all counsel.

In attempting to justify the prosecutors' comments about premeditation after the event, the State cites to caselaw that recognizes that a defendant's conduct after a killing can provide a basis by which " ' "premeditation and deliberation may be inferred . . . , provided the inference is a reasonable one." ' " *State v. Jones*, 298 Kan. 324, 336, 311 P.3d 1125 (2013); see *State v. Cravatt*, 267 Kan. 314, 329, 979 P.2d 679 (1999) (circumstances from which premeditation can be inferred include use of a deadly weapon, lack of provocation, defendant's conduct before and after the killing, threats and declarations of the defendant before and during the occurrence, and the dealing of lethal blows after the deceased was felled and rendered helpless).

This concept is well recognized and has been applied in circumstances parallel to those in this case. For example, in examining a defendant's conduct after a homicidal act, this court has indicated that a defendant's failure to seek medical attention for the victim is a circumstance from which premeditation can be inferred. *E.g.,* *State v. Hill*, 290 Kan. 339, 363, 228 P.3d 1027 (2010); *State v. Holmes*, 278 Kan. 603, 633-34, 102 P.3d 406 (2004); see *People v. Archerd*, 3 Cal. 3d 615, 621, 91 Cal. Rptr. 397, 477 P.2d 421 (1970) (defendant convicted of premeditated murder of three wives by injecting insulin, and evidence was admitted he had killed three others in the same manner; evidence established defendant was only person with each wife when injections were given and he remained with them and deliberately kept them from entering a hospital until it was too late), *disapproved on other grounds by* *People v. Nelson*, 43 Cal. 4th 1242, 78 Cal. Rptr. 69, 185 P.3d 49 (2008).

Likewise, evidence of an attempt to cover up a killing and destroy evidence can be used to infer premeditation. See *State v. Alvidrez*, 271 Kan. 143, 148-49, 20 P.3d 1264 (2001) (fleeing scene of shooting without seeking or rendering aid and lying in attempt to cover up killing could support finding of premeditation); *State v. White*, 263 Kan. 283, 296, 950 P.2d 1316 (1997) ("conduct in taking affirmative and intentional steps to destroy and conceal ev-

idence of the crime after [defendant] killed his mother indicates that he premeditated the killing").

Had the prosecutors made it clear that these circumstances allowed for an inference that Huddleston had premeditated the murder of Stover, the prosecutors would have been within the wide latitude allowed in making arguments to a jury. See *State v. Novotny*, 297 Kan. 1174, 1189, 307 P.3d 1278 (2013) (prosecutor "generally has wide latitude to make arguments based on reasonable inferences from the evidence presented at trial"). But the first prosecutor never made this link. Instead, he repeatedly referred to "[p]remeditation after the event" and used the phrase "[t]hat's premeditation" rather than indicating that those actions were circumstances from which premeditation could be inferred. The second prosecutor made the link and placed the argument in an appropriate perspective but then said, "[H]er premeditation was going on all those nine hours." Conceivably, the State might have been suggesting that murder can occur by neglecting a life-threatening medical condition one has intentionally caused—*i.e.*, depraved neglect with the intent to cause a death. But we need not sort through that question because on appeal the State only argues that the injection of insulin was the homicidal act that caused Stover's death and that the hours of neglect were circumstances from which intent and premeditation could be inferred. Hence, the suggestion that premeditation was going on after the homicidal act of giving the injection was a misstatement of the law.

Thus, both prosecutors committed misconduct.

## Step 2: Harmlessness Inquiry

Having found that there was misconduct, we must next consider whether the misconduct was so prejudicial that it denied Huddleston a fair trial. As we have discussed, this requires a harmlessness inquiry using the three *Tosh* factors, which we will restate for ease of reference: (1) Was the misconduct so gross and flagrant it denied the defendant a fair trial? (2) Did the remarks show ill will by the prosecutor? and (3) Was the evidence against the defendant of such a direct and overwhelming nature that the prosecutor's

statements would likely have had little weight in the jurors' minds? No individual factor controls. *Bridges*, 297 Kan. 989, Syl. ¶ 15.

### A. *Statements Were Gross and Flagrant*

We first consider whether the prosecutors' misconduct was gross and flagrant and indicative of ill will. "In determining whether prosecutorial misconduct was gross and flagrant, among the things an appellate court considers are whether the comments were repeated, emphasized improper points, were planned or calculated, or violated well-established or unequivocal rules. *Bridges*, 297 Kan. 989, Syl. ¶ 18.

In this case, the prosecutors' statements fit within several of these factors: They were repeated, emphasized improper points, and violated well-established law regarding the law of premeditation. As to the remaining factor of whether the statements were planned or calculated, the State suggests the statements were merely poorly worded references to the law allowing an inference to be drawn from circumstances after a death. Any merit in this argument is defeated by the number of times the phrase "that's premeditation" was inappropriately used. The repeated use of identical words suggests calculation, not an unplanned, poor choice of wording. And the law of premeditation is an area on which a prosecutor in a premeditated first-degree murder trial should be well informed.

We conclude the prosecutors' misstatements were gross and flagrant.

### B. *No Ill Will*

Nevertheless, we do not find the prosecutorial misconduct was motivated by ill will. "In determining whether prosecutorial misconduct was motivated by ill will, among the things an appellate court considers are whether the conduct was deliberate, repeated, or in apparent indifference to a court's ruling." *Bridges*, 297 Kan. 989, Syl. ¶ 19. While the prosecutors' statements were repeated, they were not in apparent indifference to a ruling of the trial judge. In fact, the only ruling came during the defense counsel's closing statement, and that ruling is broad and susceptible to multiple in-

terpretations. However interpreted, the ruling was not a clear rebuke of the State's argument.

Additionally, this court has been hesitant to characterize a misstatement as being the product of ill will where, as in this case, a prosecutor makes both a misstatement of the law and a correct recitation of the applicable law in a closing argument. See *Jones*, 298 Kan. at 340; *State v. Naputi*, 293 Kan. 55, 62, 260 P.3d 86 (2011); see also, *e.g.*, *State v. McHenry*, 276 Kan. 513, 525, 78 P.3d 403 (2003) (noting that ill will has been found in cases where the prosecutor expressed indifference to a court's rulings, mocked the defendant, or engaged in repeated acts of misconduct, and that the lack of such conduct evidences no ill will), *disapproved on other grounds by State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006). Consistent with these cases, we weigh that circumstance in our consideration of whether there was ill will.

In this case, the prosecutors correctly defined premeditation several times during closing argument. At the beginning of the first prosecutor's remarks—before making his incorrect statement of law by using the phrase "[p]remeditation after the event"—the prosecutor told the jury that premeditation "means to have thought over the matter beforehand and requires more than an instantaneous intentional act." After pointing out Huddleston told officers that she had a conversation with Edwards about killing Stover with insulin and that she said she thought about it for a couple of days, the prosecutor asked the jury, "Did she think about it? You bet. That requires more than an instantaneous, intentional act. That conduct is not instantaneous. It's opportunistic. It's not in the heat of the moment. It's planned. That conduct is not the product of an instantaneous, intentional act. No way." Then, shortly after the prosecutor made the incorrect statement of law, he correctly stated, "[D]id she think about it beforehand? It was planned. They discussed it, they conversed about it, and whether you believe Sharon Edwards gave her the idea or not, they knew she was going to do it."

Additionally, during the State's closing rebuttal argument, the second prosecutor told the jury, "[Y]ou have to determine that she premeditated it—this as an act. . . . But the idea about before,

during, and after is there are things that happened afterward that indicate that, yes, *she had a premeditation before.*" (Emphasis added.) And with regard to Huddleston's actions after Stover died, the second prosecutor said that they occurred "after premeditated acts. But that the acts and the evidence that you heard about what she did before, during, and after are things that show, yeah, she meant to kill him and she planned to kill him beforehand. That's how you consider all the evidence in this case."

These comments place the other arguments about Huddleston's actions after injecting the insulin in an appropriate context. Hence, the only factor suggesting ill will is repetition, but we do not view that factor as outweighing the other circumstances that suggest a lack of ill will.

### C. *Misstatement Was Harmless*

The final factor is whether the prosecutors' misstatements were harmless.

In this regard we first note that the jury was given a proper instruction on premeditation which comported with PIK Crim. 3d 56.04(b). Further, the trial court instructed the jury that it was to base its decision on the law and the facts, and nothing suggests the jury did not follow that admonition. Although these instructions do not give the prosecutor a free pass on misconduct, they are appropriate considerations when evaluating whether a jury was misled. See *State v. Bunyard*, 281 Kan. 392, 406-07, 133 P.3d 14 (2006) (prosecutor's misstatement of the law must be considered in the context of the jury instructions given by the court).

Further, we note that the prosecutors' improper comments, although repeated, were stated within a few short sentences, were only a small part of the prosecution's closing argument, and were tempered by other statements made by both prosecutors that reminded the jury that premeditation means to have thought over the matter beforehand. In short, while in isolation the prosecutors' statements could have caused confusion, when placed in the context of the instructions and the arguments as a whole, the jury was aware Huddleston had to think about the matter before she took actions to kill Stover.

Plus, there was overwhelming evidence that Huddleston premeditated the murder of Stover. In addition to the circumstantial evidence, there was direct evidence, through Huddleston's own statements to law enforcement officers, that she and Edwards talked about killing Stover with insulin, she thought about the plan for a couple of days before taking action, she intentionally and deliberately injected Stover with insulin and did so two times, and she knew the effects of insulin on a person who is not diabetic. Despite her incriminating statements, Huddleston argues the evidence regarding premeditation was not strong because the evidence came only from her own mouth and she made conflicting statements, at times saying things like she merely wanted to "knock his ass out." But Huddleston's actions belie any intent to simply make Stover ill. The nature of the act itself—injecting Stover twice, not just once—and Huddleston's failure to get Stover the medical assistance of someone more skilled in counteracting an insulin reaction provide a strong, almost irrefutable, inference that she premeditated her actions. While at times the State inappropriately referred to these circumstances as premeditation rather than evidence of premeditation, there was overwhelming evidence Huddleston developed a plan to give Stover two injections of insulin, she acted on that plan, and she waited several hours for that plan to be fulfilled.

In light of the evidence as a whole, we conclude beyond a reasonable doubt that the prosecutors' comments would likely have had little weight in the jurors' minds. *State v. Bridges*, 297 Kan. 989, Syl. ¶ 15, 306 P.3d 244 (2013). Therefore, the prosecutors' misstatements of law do not warrant reversing Huddleston's convictions.

## JAILHOUSE LETTERS ADMISSIBLE

Next, Huddleston argues that the trial court erred by admitting into evidence two jailhouse letters written by Huddleston to her sister Pischel. The letters were written by Huddleston more than 10 years after Stover's murder and while Huddleston was in custody awaiting trial. At trial, the court admitted the letters—referred to as Exhibits 20 and 22—over defense counsel's objections. De-

fense counsel objected to both letters on the basis of relevance, and with respect to Exhibit 22, defense counsel argued that even if it was relevant, any probative value was outweighed by the prejudice of informing the jury that Huddleston was in jail. The trial court determined that the letters were admissible under K.S.A. 2010 Supp. 60-460(f) (previous statement by the accused relative to crime charged).

On appeal, Huddleston does not take issue with the trial judge's ruling regarding K.S.A. 2010 Supp. 60-460(f) but again asserts the letters were not relevant and were more prejudicial than probative. See *State v. Shadden*, 290 Kan. 803, 817-18, 235 P.3d 436 (2010) (analysis of request to admit evidence requires four analytical steps: [1] determination of relevancy, [2] determination of which rules of evidence or principles of law apply, [3] application of applicable rules of evidence or principles of law, and [4] weighing of probative value versus prejudicial impact).

To discuss these arguments, we must consider the content of the letters.

### Huddleston's Jailhouse Letters

Huddleston's first letter, Exhibit 20, stated:

"Rhonda Lou,

"Hey! What's up Rhonda you need to take your stuff to trial. Don't admit to dropping the body off. You can get a lot of time for that.

"I'm going to blame everything on Sharon E. [T]hat's who I think did it.

"You woke me up and we were scared that's why we did what we did.

"But Sharon Edwards gave the shot, and I took the blame. Please keep to that story.

"I love you

"destroy this letter

"Who wrote you Charley who?

"W/B"

Huddleston's second letter, Exhibit 22, was lengthy, and most of it addressed personal matters unrelated to the prosecution of Stover's murder. But a portion of the letter discussed the charges. The letter included an apparent reference to statements Huddleston had made to Albert Greenly and Huddleston's daughter Crystal. Huddleston had told Albert and Crystal about Stover's death

and had pointed out to Albert the location where she had dumped the body. Law enforcement officers had discovered these statements during their investigation. In an apparent reference to the potential evidence against her, Huddleston wrote:

"About Sharon Edwards Albert & Crystal—Albert will say it cause [*sic*] I wouldn't marry him. Crystal just hates me, and Sharon's [lying] . . . . I hope my and your [lawyer] can cross her up on the stand, in the near future. They've got to catch Sharon in a lie. If you know what I mean. Sharon wasn't even there when you [slapped] Todd [Stover] was she[?] And wasn't we all there at the bar the day Todd came to the house[?] We need to make it look like Sharon E. gave the shot to him. What do you think[?] Don't you agree that that's what we need to do[?] Your [lawyer] caught Sharon [lying and] he made her look stupid. Sharon even showed her anger. I hope he will continue working like that! [H]e [is] very good. . . . W/B soon I loved my card thanks for it. One more thing about Edwards. Didn't we go to Leonine [the address where Edwards worked] to get the car[?] [I]t wasn't at home. Remember we can prove it somehow, don't you think[?]

. . . .

"Sharon Kay"

### A. Relevance

The first argument made by Huddleston requires this court's determination of whether the jailhouse letters were relevant. See *Shadden*, 290 Kan. at 817. Relevance is the threshold issue any time evidence is evaluated for admission into the record because all relevant evidence is admissible unless prohibited by statute. K.S.A. 60-407(f). K.S.A. 60-401(b) provides that evidence is relevant when it has "any tendency in reason to prove any material fact." This definition incorporates two requirements—the evidence must be both material and probative. *State v. Martinez*, 290 Kan. 992, 1009, 236 P.3d 481 (2010) (citing *State v. Dixon*, 289 Kan. 46, 69, 209 P.3d 675 [2009]). Evidence is material when the fact it supports is in dispute or an issue in the case and is probative when it has a logical tendency to prove a material fact. *State v. Prine*, 297 Kan. 460, 477, 303 P.3d 662 (2013); *State v. Reid*, 286 Kan. 494, 504-06, 186 P.3d 713 (2008); *State v. Garcia*, 285 Kan. 1, 14, 169 P.3d 1069 (2007).

Different standards of review apply when an appellate court examines the trial court's evaluation of each of those components. The determination of materiality is reviewed de novo, and the as-

sessment of probative value is reviewed under an abuse of discretion standard. *Reid*, 286 Kan. at 508-09. As to the latter standard, there are three ways in which an abuse of discretion can occur: (1) when no reasonable person would take the view adopted by the trial judge; (2) when a ruling is based on an error of law; and (3) when substantial competent evidence does not support a trial judge's finding of fact on which the exercise of discretion is based. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801, *cert. denied* 132 S. Ct. 1594 (2012). In the context of Huddleston's evidentiary arguments in this appeal, the question is whether any reasonable person would agree with the view adopted by the trial judge.

In arguing this standard is not met, Huddleston points out that the only disputed issues were whether Huddleston intended to kill Stover and whether the murder was premeditated and, according to Huddleston, "[t]he letters do not shed light on either of those issues." Instead, Huddleston argues, the letters merely discuss "how to avoid prosecution by shifting blame."

The trial judge rejected Huddleston's arguments. When discussing the relevance of Exhibit 22, the judge stated that the letter showed an attempt "on the part of one defendant to engage in a conspiracy with the other defendant to cover up the crime [and] shift the blame to somebody else, which does have a tendency to show consciousness of guilt. And in that manner may be relevant for the jury's consideration." With regard to Exhibit 20, the judge merely noted it was "a statement by the accused relative to the offense charged."

The State urges us to affirm the judge's materiality determination but also asserts several additional reasons the evidence is material. We need not address these additional reasons, however, because we agree with the determination that the letters reveal Huddleston acted in concert with her sister and indicate she was conscious of her guilt and the need to shift blame. Kansas and other state cases have held that evidence demonstrating a defendant's consciousness of guilt can be material to several issues in a criminal case, including intent, identity, plan, or other matters. See *State v. Phillips*, 295 Kan. 929, 949, 287 P.3d 245 (2012); *Dixon*, 289 Kan. at 70; *State v. Higgenbotham*, 264 Kan. 593, 603-04, 957 P.2d 416

(1998); accord *State v. Wilkins*, 269 Kan. 256, 267, 7 P.3d 252 (2000) ("Because intent 'is a mental state of the actor, the trier of fact must resort to reasonable inferences based upon examination of the surrounding circumstances to reasonably infer its existence.' "); see also, *e.g., State v. Otto*, 305 Conn. 51, 73, 43 A.3d 629 (2012) (" 'consciousness of guilt evidence [is] part of the evidence from which a jury may draw an inference of an intent to kill' "); *State v. Rechtschaffer*, 70 N.J. 395, 413, 360 A.2d 362 (1976) (declarations subsequent to commission of crime which indicate "consciousness of guilt, or are inconsistent with innocence or tend to establish intent" are relevant and admissible); *State v. Flores*, 147 N.M. 542, 550, 226 P.3d 641 (2010) (explaining that fleeing the scene and trying to evade authorities indicate a consciousness of guilt from which jury may infer deliberate intent).

Intent, as Huddleston concedes, was at issue in the case. Here, Huddleston's letters clearly reflect Huddleston acted in concert with her sister and that she wanted her sister to testify their agreement did not arise until after Stover's death. She signals this version of events was not accurate, however, by calling it a "story" and providing details she would not need to write about if they were consistent with the events Pischel had experienced. The effect was to imply that the opposite of the "story" was true—rather than developing a plan when Stover died, they had a plan before. The development of a plan before Stover's death was strong evidence of premeditation. Hence, the letters were material.

With respect to the probative nature of the evidence, we review the trial judge's decision under an abuse of discretion standard and conclude that other reasonable people could agree that the letters had a logical tendency to prove a material fact—intent.

## B. *Probative Value Versus Prejudicial Impact*

In her second argument, Huddleston argues the probative value of the evidence was outweighed by its prejudicial impact. See K.S.A. 2010 Supp. 60-445. Under this court's caselaw, a trial judge " 'may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by' " its prejudicial impact. *Shadden*, 290 Kan. at 817-18 (quoting K.S.A. 60-

445). On appeal, this determination is reviewed under an abuse of discretion standard, and the burden of proof is on the party alleging that the discretion was abused. *Garcia,* 285 Kan. at 18-19.

As at trial, Huddleston argues to this court that the jailhouse letters were unduly prejudicial because they informed the jury that she was in jail. Huddleston asserts that her reference to the "commissary" and to what she did "when they let us out again" when describing her daily routine in Exhibit 22 allowed a jury to find "out this [letter writing] was all done in custody, in the jail."

The State argues Huddleston should not be allowed to argue the letters were prejudicial because she invited the alleged error. According to the State, the invitation occurred during the trial discussion that followed defense counsel's objection, during which it was suggested that the vague references to the jail should be redacted. Defense counsel specifically rejected the idea: "I think that if the jury's going to read a small portion of [the letters] like that, they should read the entire thing to get the context of it. . . . So I'm not asking for [t]he redaction of it." It is this refusal that invited the error according to the State. Huddleston responds that her counsel was simply trying to make the best of an improper evidentiary ruling. On this point, we agree with Huddleston; under the circumstance where the defense was objecting to the admission of the entire letter, we decline to apply the invited error rule.

Nevertheless, in light of our past cases, the trial judge's offer of a potential remedy is a significant factor in our determination that the judge did not abuse his discretion. In these past cases, while we have urged trial judges to take steps to avoid making it obvious a defendant is in jail, we have been most critical when a judge has failed to take into account the legal principles relating to the potential taint and to take steps to control the taint. See, *e.g., Ward,* 292 Kan. at 576 ("a trial court almost always abuses its discretion to control the courtroom when it allows a defendant, witness, or nonwitness to be brought before a jury in jail clothing without an articulated justification explaining why it is necessary for the person to wear jail clothing" and without considering options to mitigate the potential taint). Here, the judge recognized the problem and

proposed solutions. Further, the judge weighed the possible prejudicial impact and stated:

"There's some concern that's been expressed about the jury becoming aware that Ms. Huddleston is in custody. We dance around that issue all the time. And frankly, I think juries are savvy enough and have enough insight to recognize when there's two armed deputies in the courtroom guarding the doors, I think if we went back there right now and asked them what they thought, they would probably say we have a reason to believe she's probably in custody. Do I tell them that directly? I don't think I want to do that, no.

. . . .

"Are they aware that that probably is the case? I think there is probably a 95 percent possibility that they are aware. So that alone, I don't think, is a satisfactory basis to not allow into evidence evidence that's . . . relevant and probative and deals with the material issues in the case.

"So I just wanted to make that statement on the record. So that when the appellate court looks at all this, if they ever do, and they probably will, they can have some ability to gain some insight about this judge's perspective about that matter. I think the jury probably is aware. So that issue is not a primary reason for me to make any ruling on this . . . issue . . . ."

Along lines similar to the trial judge's reasoning, this court has held that photographs depicting defendants in jail clothing were admissible, explaining "that most jurors would hardly be shocked to learn that a murder suspect was taken into custody for some period of time, the only information communicated by jail clothing." *State v. Smith*, 278 Kan. 45, 49, 92 P.3d 1096 (2004); see *State v. McCleese*, 94 Conn. App. 510, 515, 892 A.2d 343 (State's inadvertent question regarding defendant's pretrial incarceration did not deprive defendant of fair trial where "the defendant was on trial for murder, conspiracy to commit murder and assault"; "[i]t is reasonable to believe that the jury could have suspected that the defendant, at some point before trial, had been incarcerated"), *cert. denied* 278 Conn. 908 (2006).

The evidence in this case does not even rise to the level of photographs depicting jail clothing. Instead, there are only vague references to Huddleston's being held in jail. Assuming the jury even reached the conclusion Huddleston was incarcerated, reasonable people could agree with the trial judge and conclude the probative value of the letters outweighed any minimal prejudicial effect generated by the inference of Huddleston's incarceration. The judge's

decision to allow the State to introduce the jailhouse letters was not an abuse of discretion.

Affirmed.