NOT DESIGNATED FOR PUBLICATION

No. 117,026

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ROBERT TRAVIS JENKINS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Seward District Court; BRADLEY E. AMBROSIER, judge. Opinion filed May 25, 2018. Affirmed.

*Clayton J. Perkins*, of Kansas Appellate Defender Office, for appellant.

*Russell Hasenbank*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., MALONE and ATCHESON, JJ.

ATCHESON, J.:  After sorting through conflicting testimony about an early morning confrontation in downtown Liberal, a jury sitting in Seward County District Court convicted Defendant Robert Travis Jenkins of aggravated robbery. On appeal, Jenkins contends the verdict should be set aside because the prosecutor intentionally excluded potential jurors during the selection process at the start of the trial based on their race and delivered an improper closing argument to the jury at the end of the trial and because the district court failed to instruct the jury on battery as a lesser included offense of

1

aggravated robbery. Jenkins has not shown reversible error for any of those reasons. We, therefore, affirm his conviction and sentence.

FACTUAL BACKGROUND

Abdifathah Hassan Hashi, the robbery victim, met Mohammad Jama, his friend and coworker, at a bar in Liberal shortly before midnight on Halloween in 2015. Hashi drank heavily until closing time about two hours later and became quite intoxicated. Jama abstained. While at the bar, Hashi exchanged text messages with Raeanne Winters, who he had met briefly sometime earlier. Winters worked as a dancer at a gentlemen's club across the state line in Oklahoma. Hashi arranged to rendezvous with Winters near the parking lot of a downtown bank.

Jama drove Hashi to the location and waited in their car as Hashi approached Winters' sedan. According to the account Winters and Jenkins offered at trial, Hashi made an untoward sexual suggestion to Winters. Jenkins interceded, and he and Hashi quickly began exchanging punches. Jenkins knocked Hashi to the pavement. Hashi, however, described a friendly exchange with Winters. He said Jenkins suddenly attacked him for no reason. Although he tried to fend off Jenkins, he could not. Hashi retreated toward Jama and realized he was missing a bankroll of $400, his cell phone, and a debit card his employer issued to him. As Hashi got into the car with Jama, Winters' sedan passed by them. They decided to give chase. While Jama pursued the sedan, Hashi called 911 to report he had been robbed and provided a description of the sedan, Winters, and Jenkins.

After receiving the report of a possible robbery, Liberal Police Sergeant Dallas Ryan saw Winters' sedan heading away from the vicinity of the bank. He immediately initiated a felony traffic stop. Sgt. Ryan ordered Winters and Jenkins out of the sedan, and upon seeing they matched the description of the persons involved in the robbery, he

2

placed them under arrest. Sgt. Ryan then had a communications specialist call Hashi's cell phone. A phone on the driver's side floorboard of the sedan began ringing. Sgt. Ryan recovered the cell phone. Hashi later identified the phone as his. He told the officers investigating the robbery that the face of the phone had not been cracked before it was taken from him. Ryan also recovered a makeup case from the sedan. The case contained about $345 in cash in one compartment and about $120 in cash in a second compartment. Hashi's debit card never turned up. After Winters and Jenkins were arrested, officers advised them of their *Miranda* rights and attempted to question them about the incident. Winters and Jenkins both invoked their constitutional right to remain silent and declined to answer questions.

In a videotaped statement taken shortly after the events, Hashi outlined for investigators what happened. He identified his passport and a set of keys as among the items taken from him, although he later found them at home. He also at least implied the face of the cell phone was cracked before the robbery, an implication inconsistent with his earlier account.

The jury heard the case during two days in early August 2016. Hashi, Jama, and Sgt. Ryan testified for the State, along with other witnesses. The jury also watched Hashi's videotaped statement. At trial, Winters and Jenkins testified as defense witnesses. Winters told the jury she had earned the money in the makeup case working at a club earlier that night. She also explained she saw Hashi's cell phone on the pavement immediately after the fight and picked it up because she thought it belonged to Jenkins. Jenkins testified that he perceived Hashi as being threatening toward Winters and sought to calm things down. But Hashi didn't back away and appeared to be drunk. According to Jenkins, the two of them wound up throwing punches. Jenkins denied taking money or anything else from Hashi.

There were a number of discrepancies across the various accounts of what happened between Hashi and Jenkins. Those differences were for the jury to sort out, and we have no need to catalogue them here. See *Golden v. Den-Mat Corp.*, 47 Kan. App. 2d 450, 465, 276 P.3d 773 (2012) ("Jurors sort out varied facts and their implications at trial."); *State v. Bellinger*, 47 Kan. App. 2d 776, 807, 278 P.3d 975 (2012) (Atcheson, J., dissenting). But we mention in passing Dekow Omar, a friend of Hashi's, who testified as a defense witness. He claimed to have been with Hashi and Jama at the bar and when they drove to the encounter with Winters. Neither Hashi nor Jama mentioned being with Omar. According to Omar, the three men believed they were headed for an assignation with Winters. When she then objected, Jenkins intervened. Omar testified that he never saw Jenkins take anything from Hashi and that he had seen damage to the face of Hashi's cell phone before that night.

The charges against Jenkins evolved over the course of the prosecution and initially included drug crimes based on controlled substances Sgt. Ryan found in Winters' sedan. The drugs, however, could not be legally attributed to Jenkins. See *State v. Abbott*, 277 Kan. 161, 167-69, 83 P.3d 794 (2004) (passenger could not be convicted of possession of drug paraphernalia for items found in rear seat pocket of motor vehicle without some evidence showing his knowledge and intent to possess). The only charges submitted to the jurors at the close of the evidence were the aggravated robbery of Hashi, a severity level 3 person felony, and criminal damage to Hashi's cell phone, a misdemeanor. As we have indicated, the jurors convicted Jenkins of aggravated robbery and found him not guilty of criminal damage to property. The district court later ordered Jenkins to serve 221 months in prison, reflecting the presumptive mitigated punishment under the sentencing guidelines based on his criminal history. Jenkins has timely appealed.

4

On appeal, Jenkins contends the prosecutor impermissibly exercised peremptory challenges to remove potential jurors based on their ethnicity and gave a closing argument that deprived him of a fair trial. He also says the district court should have instructed the jury on battery as a lesser included offense of aggravated robbery. As we have indicated, we see no reversible error on those points. We, likewise, decline to reverse based on Jenkins' claim of cumulative error.

*Jury Selection*

Jenkins argues the prosecutor used peremptory challenges to remove two Hispanic women as potential jurors in this case because of their ethnicity. If that were true, the prosecutor would have violated the constitutional rights of those women and of Jenkins, and the violation would require that we reverse the conviction and remand for a new trial in front of a jury chosen through a race-neutral process. We are significantly handicapped in assessing this issue—commonly known as a *Batson* challenge—because the lawyers and the district court failed to develop a good hearing record in addressing Jenkins' objection to the selection of the jurors. Given what we have to review, we cannot say the district court erred in denying Jenkins' *Batson* challenge. To explain our conclusion, we first outline the constitutional rights at issue and the judicially developed methodology aimed at protecting those rights. We then assess how the lawyers and the district court handled the issue here in light of that methodology.

We necessarily begin with *Batson v. Kentucky*, 476 U.S. 79, 88-89, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and the United State Supreme Court's holding that in criminal cases, prosecutors may not rely on race as a criterion to excuse African-Americans called as potential jurors. In *Batson*, the Court recognized twin equal protection considerations supporting a prohibition on the State's use of racially based

peremptory challenges or juror strikes. First, defendants are denied the right to equal protection if the State seeks to try them before juries "from which members of [their] race have been purposefully excluded." 476 U.S. at 85. Just as important, however, citizens called for jury duty have a constitutional right to serve if they are otherwise qualified. The State violates that right when a prosecutor eliminates them during the jury selection process because of their race. 476 U.S. at 87. Exclusion of citizens from jury service based on race reflects "a primary example of the evil the Fourteenth Amendment was designed to cure." 476 U.S. at 85; see *Miller-El v. Dretke*, 545 U.S. 231, 237-38, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) (noting the dual equal protection violations attendant to the State's race-based removal of potential jurors during the selection process).

The United States Supreme Court has extended the rule of *Batson* to permutations of the essential fact pattern present there—the State's systematic use of peremptory strikes to remove African-Americans from the jury pool in the trial of an African-American defendant on criminal charges. For example, a Caucasian defendant may assert a *Batson* challenge to the prosecutor's apparently deliberate removal of African-Americans called as jurors in a criminal case. *Powers v. Ohio*, 499 U.S. 400, 402-03, 416, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). The State may challenge a defendant's use of peremptory challenges in what appears to be a racially motivated fashion. *Georgia v. McCollum*, 505 U.S. 42, 59, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992). Particularly pertinent here, the Court has recognized that Hispanics reflect a sufficiently identifiable racial or ethnic group to be protected by the *Batson* rule. *Hernandez v. New York*, 500 U.S. 352, 355, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (prosecutor's deliberate exclusion of Hispanics from jury would violate Equal Protection Clause); see *State v. Pham*, 281 Kan. 1227, 1237-38, 136 P.3d 919 (2006) (recognizing *Batson* rule applies to Hispanics called for jury duty).[1]

[1]The United States Supreme Court has also extended the principle underlying *Batson* to the State's systematic exclusion of women from juries based on gender. *J.E.B.*

6

*v. Alabama ex rel. T.B.*, 511 U.S. 127, 129, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994). Some courts have recognized *Batson* challenges to the removal of potential jurors because of their religious beliefs. See *United States v. Brown*, 352 F.3d 654, 668-69 (2d Cir. 2003); but *cf. United States v. Girouard*, 521 F.3d 110, 113 (1st Cir. 2008) (regarding the question as an open one and declining to decide it). Likewise, neither plaintiffs nor defendants in civil cases may purposefully strike potential jurors because of their race. *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 616, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991).

All of those decisions reflect the independent significance of the equal protection rights of citizens called to jury service to participate in the judicial process without racial discrimination. See *Powers*, 499 U.S. at 402, 409. A defendant's *Batson* challenge serves to protect the rights of those citizens, since they are not in a position to efficiently or effectively assert their own rights. 499 U.S. at 413-15. And the eradication of purposeful racial discrimination in juror selection promotes the integrity of the judicial system in the eyes of the litigants, other participants, and the community as a whole. *McCollum*, 505 U.S. at 48-49; *Powers*, 499 U.S. at 412-13.

The ultimate question in a *Batson* challenge asks whether the prosecutor has purposefully and deliberately sought to exclude potential jurors because of their race. The analytical framework for answering that question draws on the model developed in employment discrimination cases to probe an employer's intent in hiring, firing, promoting, or otherwise making work related decisions. *Johnson v. California*, 545 U.S. 162, 170-71 & n.7, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005). Because purposeful racial discrimination typically is difficult to prove—seldom will the discriminatory actor admit the illicit purpose—the approach imposes shifting burdens of production of circumstantial evidence. The inquiry advances in three stages. *Foster v. Chatman*, 578 U.S. ___, 136 S. Ct. 1737, 1747, 195 L. Ed. 2d 1 (2016); *State v. Kettler*, 299 Kan. 448, 461-62, 325 P.3d 1075 (2014).

The party challenging the peremptory strikes—here, the criminal defendant alleging racial discrimination in the State's selection of jurors—has to make a prima facie showing of impermissible intent on the part of the prosecutor. *Miller-El*, 545 U.S. at 239; *Johnson*, 545 U.S. at 167; *State v. McCullough*, 293 Kan. 970, 992, 270 P.3d 1142 (2012). The burden at the first stage is not intended to be onerous. *Johnson*, 545 U.S. at 170 (initial burden satisfied if the proffered evidence is "sufficient to permit the trial judge to draw an inference that discrimination has occurred"). The systematic use of peremptory challenges to remove members of a protected racial class from the pool of potential jurors typically would suffice. *Miller-El*, 545 U.S. at 240-41. The exercise of a few peremptory strikes (among many) to remove all members of an identifiable ethnic group from the jury pool may suffice as a prima facie indicator of impermissible animus. See *Johnson*, 545 U.S. at 173. The prosecutor's disparate questioning of Hispanic and Caucasian jurors in an apparent effort to generate grounds to disqualify the Hispanics for cause likely would establish a prima facie case for the later use of peremptory strikes to keep those persons from serving on the jury. See *Miller-El*, 545 U.S. at 255-60.

If the defendant presents such evidence, the prosecutor is then obligated to state a racially neutral reason for the exercise of the disputed peremptory challenges. *Miller-El*, 545 U.S. at 239; *Johnson*, 545 U.S. at 168; *McCullough*, 293 Kan. at 992. Again, the burden at that second stage is slight. *Purkett v. Elem*, 514 U.S. 765, 767-68, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) ("The second step of this process does not demand an explanation that is persuasive, or even plausible."). The prosecutor's ability to voice a nondiscriminatory rationale for his or her approach to juror selection does not in and of itself defeat the *Batson* challenge. *Miller-El*, 545 U.S. at 240. That simply advances the district court's inquiry to the third step and the ultimate question of whether purposeful discrimination has been shown based on all of the available evidence. 545 U.S. at 251-52; *Purkett*, 514 U.S. at 768; *McCullough*, 293 Kan. at 993-94. The district court must determine if the prosecutor's stated reasons for excluding the potential jurors are the true reasons or merely a pretext—a cover-up—for impermissible racial discrimination. As the

8

*Purkett* Court explained: "At that [third] stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." 514 U.S. at 768. In making that call, the district court may look at various forms of circumstantial evidence. *Miller-El*, 545 U.S. at 253. The party asserting the *Batson* challenge bears the ultimate burden of proving by a preponderance of the evidence that racial discrimination or intent motivated the peremptory strikes. *Crittenden v. Ayers*, 624 F.3d 943, 958 (9th Cir. 2010); *United States v. Martinez*, 621 F.3d 101, 109 (2d Cir. 2010); *United States v. Tucker*, 90 F.3d 1135, 1142 (6th Cir. 1996).

A variety of circumstances can indicate pretextual justifications for race based decisions. For example, shifting reasons for removing a potential juror may indicate pretext. *Foster*, 136 S. Ct. at 1750-51. That is, should an initial reason look unpersuasive under closer scrutiny, the prosecutor's sudden recollection of another reason suggests neither may be the real reason. See *Miller-El*, 545 U.S. at 245-46. Similarly, if the stated reason for striking the potential juror pertains to a particular experience or characteristic disclosed during voir dire, the prosecutor's failure to ask further about that circumstance may indicate the information really wasn't significant and has been offered to paper over an impermissible reason. See *Snyder v. Louisiana*, 552 U.S. 472, 481, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008); *Miller-El*, 545 U.S. at 244-46. If the prosecutor removes an ethnically identifiable juror ostensibly because of certain experiences or characteristics yet retains as jurors Caucasians with the same or similar experiences or characteristics, pretext looms over those decisions. *Foster*, 136 S. Ct. at 1750-51; *Snyder*, 552 U.S. at 483-84; *Miller-El*, 545 U.S. at 241, 244-48; *McCullough*, 293 Kan. at 995. In *Foster*, the Court found the prosecution trial team's notations about potential jurors unmistakably showed race to be a consideration that corresponded to the use of peremptory strikes to excuse African-Americans. 136 S. Ct. at 1755. A court may also consider historical data or information on the State's practices in excluding African-American or Hispanic jurors in other cases in the relevant district. *Miller-El*, 545 U.S. at 253; see *Batson*, 476 U.S. at

95 (defendant may present evidence of purposeful exclusion of African-Americans across multiple cases but need not do so).

The search for the true intent behind a decision to keep or reject a potential juror is not necessarily an easy one. *Miller-El*, 545 U.S. at 238 ("The rub has been the practical difficulty of ferreting out discrimination in selections discretionary by nature."). Just as employers seldom acknowledge making workplace decisions based on impermissible criteria, such as race or gender, neither do lawyers picking juries. See *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 n.8, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) (sequencing of proof in employment discrimination cases "intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination"); *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 576 (7th Cir. 2001) ("employers are generally very careful to avoid statements that suggest discriminatory intent—whether their true intentions are discriminatory or not*")*. The search, however, may be more confounding in assessing conduct in the courtroom than in the boardroom given the nature of peremptory challenges to potential jurors. By their very definition, those challenges require no reason be given at the time they are made, and they need not rest on studied or even rational choices. *Miller-El*, 545 U.S. at 238. A great deal of folklore has developed around the tendencies and predispositions of potential jurors based on occupation, education, and similar characteristics. See 2 Bailey and Fishman, Criminal Trial Techniques § 39:50 (2009); Wenke, The Art of Selecting a Jury, p. 75 (2d ed. 1989). Lawyers may have idiosyncratic likes and dislikes in selecting jurors and can use peremptory challenges to serve those preferences. *Miller-El*, 545 U.S. at 252 ("peremptories are often the subject of instinct"). And a lawyer who has picked more than a few juries appreciates the value of a peremptory challenge to remove the potential juror with a grating personality who might well annoy or antagonize his or her colleagues in the jury room, inhibiting both cooperative deliberations and a verdict. In short, peremptory challenges may be exercised based on generalizations, impressions, or irrationalities but not as a means of excluding potential jurors based on protected class characteristics of race or gender.

10

In the context of a defendant's *Batson* challenge, the district court then often faces a daunting task in sorting true (if sometimes strange) reasons for keeping or discarding potential jurors from subterfuges intended to mask impermissible discrimination. The district court's determination commonly will depend on circumstantial evidence, including the reasons articulated, the way they are articulated, and how they square up with the prosecutor's decisions in picking some potential jurors and excluding others who seem to share common backgrounds or dispositions other than race. The district court is, effectively, passing on the credibility of the prosecutor, so demeanor generally plays a part in the decision. *Snyder*, 552 U.S. at 477. The district court also will have had the opportunity to observe the prospective jurors and the selection process to gauge reasons prosecutors may offer based on nonverbal behaviors or cues of a particular juror or other characteristics that might not otherwise be evident from a transcript of the voir dire. 552 U.S. at 477.

As a result, appellate courts must afford considerable deference to those determinations. *Foster*, 136 S. Ct. at 1747; *Snyder*, 552 U.S. at 477 (matters of credibility and demeanor singularly rest within the district court's purview); *Batson*, 476 U.S. at 98 & n.21; *State v. Dupree*, 304 Kan. 43, 60, 371 P.3d 862 (2016). The Court has stated that on appellate review, the district court's ruling on discriminatory intent underpinning a *Batson* challenge must be accepted "unless it is clearly erroneous." *Snyder*, 552 U.S. at 477. The Kansas Supreme Court has applied an abuse of discretion standard. *McCullough*, 293 Kan. at 992. For purposes of resolving a *Batson* challenge, we see little practical difference.[2]

[2] A district court may be said to have abused its discretion if the result it reaches is "arbitrary, fanciful, or unreasonable." *Unruh v. Purina Mills*, 289 Kan. 1185, 1202, 221 P.3d 1130 (2009). That is, no reasonable judicial officer would have come to the same conclusion if presented with the same record evidence. An abuse of discretion may also occur if the district court fails to consider or to properly apply controlling legal standards.

11

*State v. Woodward*, 288 Kan. 297, 299, 202 P.3d 15 (2009). A district court errs in that way when its decision "'goes outside the framework of or fails to properly consider statutory limitations or legal standards.'" 288 Kan. at 299 (quoting *State v. Shopteese*, 283 Kan. 331, 340, 153 P.3d 1208 [2007]). Finally, a district court may abuse its discretion if a factual predicate necessary for the challenged judicial decision lacks substantial support in the record. *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011). The clearly erroneous standard functionally replicates the second and third aspects of the abuse of discretion standard. See *Anderson v. Bessemer City*, 470 U.S. 564, 573-75, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985) (clearly erroneous standard as to factual findings); *United States v. Battle*, 706 F.3d 1313, 1317 (10th Cir. 2013) ("A district court abuses its discretion when it relies on an incorrect conclusion of law or a clearly erroneous finding of fact.").

The exclusion of even a single potential jury through a party's use of a peremptory challenge for a racially discriminatory purpose creates a constitutional violation. *Foster*, 136 U.S. at 1747. As we have pointed out, the prospective juror has been the victim of impermissible invidious discrimination violating the Equal Protection Clause. Moreover, the injection of racial animus in the selection of jurors undermines both the appearance and reality of fundamental fairness in the judicial process. The resulting impact on a criminal prosecution effectively amounts to a structural error, requiring the reversal of any conviction without regard to the strength of the evidence supporting the guilty verdict. *Weaver v. Massachusetts*, 582 U.S. ___, 137 S. Ct. 1899, 1911-12, 198 L. Ed. 2d 420 (2017) (like errors "deemed structural," *Batson* violation requires "automatic reversal"); *Crittenden v. Chappell*, 804 F.3d 998, 1003 (9th Cir. 2015) (describing *Batson* violation as structural error); *United States v. McAllister*, 693 F.3d 572, 582 n.5 (6th Cir. 2012) (recognizing *Batson* violation not subject to harmless error review and characterizing harm as structural error); cf. *Vasquez v. Hillery*, 474 U.S. 254, 263-64, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986) (government's deliberate exclusion of African-Americans from grand jury indicting defendant undermines "structural integrity" of criminal justice process, cannot be excused as harmless error, and requires reversal of guilty verdict at trial). The Kansas Supreme Court has similarly recognized that a prosecutor's purposeful exclusion of potential jurors based on race requires a defendant be granted a new trial. See *Kettler*, 299 Kan. at 461-62.

In this case, the prosecutor and Jenkins' lawyer passed 28 potential jurors for cause, meaning none of those individuals responded to questions in a way suggesting they could not fairly and impartially listen to the evidence and return an unbiased verdict. See K.S.A. 22-3411a. Each side then had the right to peremptorily excuse or strike eight of the 28 potential jurors, yielding 12 individuals who would then sit as the jury. K.S.A. 2017 Supp. 22-3412(a)(2)(B). Beginning with the prosecution and then alternating, each lawyer identified by name a potential juror to be excused. The district court oversaw that process outside the presence of the potential jurors and did not formally excuse any of them until both sides had exercised all of their strikes.

As we have indicated, a party need not give a reason for peremptorily removing a potential juror unless the opposing party challenges the strike as a potential *Batson* violation. We leave for another case whether a district court can or should raise a possible *Batson* problem on its own initiative. See *People v. Rivera*, 221 Ill. 2d 481, 515, 852 N.E.2d 771 (2006) (trial court may raise a "*Batson* issue" if evidence suggestive of prohibited animus "is abundantly clear"); *State v. Evans*, 100 Wash. App. 757, 763, 998 P.2d 373 (2000). Jenkins, through his lawyer, challenged the prosecutor's first and third peremptory strikes as directed at Hispanic females and the sixth strike as directed at an African-American female. On appeal, Jenkins has not disputed the district court's denial of his *Batson* challenge to the African-American woman, so we do not consider that ruling further.

Because of the way the lawyers and the district court handled the *Batson* issue, they failed to develop a sufficient factual record for us to assess the issue. Material information was either never discussed on the record or never considered in assessing Jenkins' challenges. What we have is wholly inadequate to review the propriety of the prosecutor's disputed strikes. See *Kettler*, 299 Kan. at 464-65 (court declines to reverse denial of defendant's *Batson* challenge in light of inadequate trial record).

13

Here, Jenkins' lawyer lodged and the district court addressed a *Batson* challenge after the prosecutor's first strike. Everyone apparently agreed the potential juror was Hispanic. The district court asked the prosecutor for a race-neutral reason and he cited her young age. The record indicates she was 22 years old. The district court properly found that to be a race-neutral reason and immediately denied the challenge. The district court did not ask Jenkins' lawyer for any additional evidence that would suggest the reason to be a pretext for purposeful racial discrimination. And the lawyer did not request the opportunity to speak to the third stage in an appropriate *Batson* inquiry into intent. Before turning to the prosecutor's third strike—the other one Jenkins disputes on appeal—we outline other problems with the approach the lawyers and the district court took here.

First, the district court should have deferred the *Batson* issue until both sides had exercised all of their peremptory challenges. In the face of a *Batson* challenge at that point, the district court should have stated on the record the composition of the 28-person panel passed for cause by race and gender. The lawyers should have been allowed to agree or disagree with the district court's characterization of the makeup of the panel and to outline their disagreements. That demographic information would have established a baseline against which to measure the impact of the strikes. The hearing record similarly contains no comparable information on the composition of the jury itself. The appellate record does include a list of the names of the 12 persons seated as jurors prepared for purposes wholly unconnected to the *Batson* challenges.[3]

[3]For what it is worth, the list of jurors includes two names that are obviously Hispanic. As we discuss, the courts have been reticent to assume or infer the ethnic identity of a prospective juror for *Batson* purposes based on his or her surname alone. Jenkins' lawyer indicated he intended to lodge a *Batson* challenge as to any Hispanic or African-American the prosecutor peremptorily struck from the jury panel. So the juror list coupled with the hearing record suggests the prosecutor peremptorily excused several Caucasians and left at least two Hispanics as jurors. But we really don't have the kind of

tailored findings compiled in conjunction with the *Batson* challenges to warrant such a conclusion.

Second, by immediately taking up Jenkins' challenge to the prosecutor's first peremptory strike, there was no evidence of a discriminatory pattern. There couldn't be because the prosecutor still had seven strikes to exercise. If all of them had been exercised to remove Hispanics that would be significant circumstantial evidence of purposeful discrimination. If such a pattern emerged, Jenkins' lawyer presumably could have revisited the first strike. Likewise, at the time of the first strike, there was no evidence to suggest the prosecutor's stated reason—the potential juror's age—was a pretext. But that's only because there was no way to tell who the prosecutor would leave on the jury. If the prosecutor declined to use peremptory strikes to remove one or more Caucasians of about the same age, the stated reason looks suspicious.

Finally, the district court should have clearly and explicitly engaged the third stage of the *Batson* inquiry into intent. But the district court's omission does not, in and of itself, establish or amount to a *Batson* violation. The record does not show Jenkins' lawyer was denied the opportunity to show the prosecutor's stated reason for excusing the potential juror was pretextual. And on appeal he points to no evidence supporting that conclusion.

The prosecutor's third peremptory strike creates another wrinkle. Jenkins, through his lawyer, objected on the grounds the woman had an identifiably Hispanic surname. The record does confirm that much. The prosecutor responded that he did not think the woman was Hispanic. The district court then asked the prosecutor for a racially neutral reason "assum[ing] she is [Hispanic]." The prosecutor responded that he "[j]ust didn't like her." That sort of subjective and wholly undefined basis for exercising a peremptory challenge does not satisfy even the decidedly relaxed requirement for a race neutral reason under the second stage of the *Batson* inquiry. Cf. *Purkett*, 514 U.S. at 768-69

15

(prosecutor's unsupported denial of racial motive insufficient; stated reason, though illogical, must be anchored in some factual representation that does not deny equal protection).

The district court asked Jenkins' lawyer to expand upon the basis for his challenge. He reiterated that the woman had a Hispanic name but hedged on whether she indisputably looked Hispanic. The district court suggested the lawyers could augment the record by reopening the examination of the potential jurors to ask the woman about her surname and how she identifies herself ethnically. The district court went on to allow the prosecutor's peremptory strike "as it is." The district court then specifically invited Jenkins' lawyer to revive the matter of the woman's ethnicity "when we're all done today" if he wished to pursue it further. As far as the record indicates, the lawyer did not take up the invitation to question the woman further or to present other evidence bearing on her ethnicity.

Although the district court was something less than clear in its ruling, we reasonably infer the district court concluded based on all of the circumstances, including its observations during jury selection, that the woman was not Hispanic and, therefore, Jenkins' lawyer had failed to satisfy the first step in the *Batson* inquiry. Courts have held that peremptorily striking a juror with an identifiably ethnic surname does not itself establish prima facie evidence of impermissible discrimination. See *United States v. Campione*, 942 F.2d 429, 433 (7th Cir. 1991); *United States v. Esparsen*, 930 F.2d 1461, 1466 (10th Cir. 1991); *State v. Alvarado*, 226 Neb. 195, 198-99, 410 N.W.2d 118 (1987); *State v. Alvarez*, 872 P.2d 450, 457 n.6 (Utah Sup. Ct. 1994); cf. *People v. Gutierrez*, 2 Cal. 5th 1150, 1156 & n.2, 395 P.3d 186 (2017) (prosecutor's pattern of striking potential jurors based on Hispanic surnames or ethnic appearance established prima facie discrimination).[4]

[4]Many married women use their husbands' surnames. Given the record here, we have no way of knowing if the prospective juror may have been married to a Hispanic man at the time or even had retained a married name after a divorce. We need not address whether a Caucasian called for jury duty could be peremptorily struck without violating *Batson* because he or she is married to a Hispanic or an African-American. See *United States v. Guillot*, No. 93-2572, 1995 WL 73288, at *2 (6th Cir. 1995) (unpublished opinion) (assuming non-Hispanic married to Hispanic within class protected under *Batson*); *Small v. Milyard*, No. 10-cv-01014-WJM, 2011 WL 2714121, at *16 (D. Colo. 2011) (unpublished opinion); contra, *United States v. Cantu*, No. 93-3238, 1995 WL 122792, at *5 (6th Cir. 1995) (peremptory strike of Caucasian married to Hispanic does not establish prima facie *Batson* violation).

Jenkins' lawyer simply did not pursue the matter following the district court's ruling. He did not argue that he had generated prima facie evidence of discriminatory animus. He did not point to additional evidence to support that conclusion. And he did not take additional steps to establish whether the potential juror was Hispanic. Given the record evidence, we see nothing permitting us to reverse the district court's decision allowing the prosecutor's third peremptory strike.

The poorly developed record on Jenkins' *Batson* challenges fails to show any impermissible racial animus on the prosecutor's part in selecting the jury. The parties and the district court should have done better in making a record. But we cannot and do not venture any suggestion about what a thorough airing of the challenges would have shown.

In some cases, a remand might be appropriate. If, for example, the district court failed to resolve a material conflict in the evidence and ruled against the party asserting the *Batson* challenge, a remand probably would be in order so the conflict could be settled and the evidence reevaluated in light of that resolution. Here, however, we have no evidence on critical points, such as the demographic composition of the original array of potential jurors passed for cause and of the jury seated to hear the case. Nor do we have evidence about the seated jurors that might cast doubt on the prosecutor's stated

reason for exercising his first peremptory challenge. We see no particularly reliable means to generate that information now, more than 18 months after the trial. Jenkins has not suggested a way that might be accomplished, although he has asked for remand as an alternative remedy to reversal of his conviction. We find no demonstrable *Batson* violation in the jury selection process and no basis for granting Jenkins relief on that point.

*Jury Instructions*

On appeal, Jenkins contends the district court should have instructed the jury on battery as a lesser included offense of aggravated robbery. He did not request the instruction in the district court, so we review for clear error. *State v. Williams*, 295 Kan. 506, 516, 286 P.3d 195 (2012). Had Jenkins asked for a battery instruction, the district court properly would have denied the request as legally inappropriate. See *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012) (jury instruction must be legally appropriate to predicate error on its omission).

For a crime to be a lesser included offense, its elements must be identical to some of the elements of the greater offense. K.S.A. 2017 Supp. 21-5109(b)(2); *State v. Ramirez*, 299 Kan. 224, 226, 328 P.3d 1075 (2014). In other words, if the greater offense is proved, then the lesser offense must have been proved, as well. Jenkins does not argue that battery is a lesser degree of the same generic crime as aggravated robbery, which would support a jury instruction under K.S.A. 2017 Supp. 21-5109(b)(1). That argument would find no support in the law. See *State v. Plummer*, 45 Kan. App. 2d 700, 703-05, 251 P.3d 102 (2011) (theft lesser degree of robbery because both entail wrongful taking of another's property and share lineage from common-law crime of larceny), *aff'd* 295 Kan. 156, 283 P.3d 202 (2012).

The Kansas Supreme Court addressed this issue in *State v. Frierson*, 298 Kan. 1005, 1019, 319 P.3d 515 (2014), and held that under the criminal code in effect before 2011, battery was not a lesser included offense of aggravated robbery. The court pointed out that aggravated robbery required the defendant cause bodily harm to a person in the course of obtaining possession of property through force or the threat of bodily harm. But the crime required no particular intent—or any intent, for that matter—on the defendant's part to cause bodily harm. See K.S.A. 21-3427. Conversely, battery required a defendant to intentionally or recklessly cause bodily harm to the victim, thereby imposing a mental element not required for aggravated robbery. K.S.A. 21-3412(a)(1). Battery, therefore, was not a lesser included offense. 298 Kan. at 1019.

Jenkins says *Frierson* is no longer applicable because the 2011 recodification of the criminal code redefined and modified the requisite mental states for various crimes. See K.S.A. 2017 Supp. 21-5202 (defining "culpable mental states" under new code). Although the recodification did alter the applicable mental states in some respects, those changes do not undercut the reasoning and result in *Frierson*. As now defined in K.S.A. 2017 Supp. 21-5420, aggravated robbery still requires that a defendant inflict bodily harm on a person in the course of a robbery. And the recodified version adds no intent component to the bodily harm requirement. Under the recodification, battery criminalizes a defendant's actions in "knowingly or recklessly" causing bodily harm to another person. K.S.A. 2017 Supp. 21-5413(a)(1). The recodification, therefore, retains the difference in elements between aggravated robbery and battery the *Frierson* court found dispositive of the lesser included offense issue. That is, the bodily harm component of aggravated robbery requires no intent, while the bodily harm component of battery does. Accordingly, battery requires proof of an element in addition to what would be required for proof of aggravated robbery, and it, therefore, cannot be a lesser included offense. The district court did not err in failing to instruct the jury on battery as a lesser included offense of aggravated robbery.

19

*Closing Argument*

Jenkins contends the prosecutor's closing argument to the jury deprived him of a fair trial in three ways: (1) by impermissibly attacking his and Winter's credibility based on their decisions not to speak with the police in conformity with their *Miranda* rights—what's known as a *Doyle* violation; (2) by shifting the burden of proof to him with negative comments about his failure to explain his version of the events until trial; and (3) by expressing a personal opinion about the credibility of some of the witnesses. We take up those arguments in order and find no reversible error.

To assess impropriety in a prosecutor's closing argument, the Kansas appellate courts now deploy the analytical model outlined in *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016), that first considers "error" and then weighs any "prejudice" to the defendant resulting from an error. Comments made during argument will be considered error if they fall outside the wide latitude afforded a prosecutor in discussing the evidence and the law. 305 Kan. at 109. This simply transplants the initial step in the former analytical process. 305 Kan. at 104-05. If an appellate court finds the challenged argument to be prosecutorial error, it must then consider prejudice measured by the test set out in *Ward*, 292 Kan. 541, Syl. ¶ 6, for constitutional error. The State, as the party benefiting from the error, must demonstrate "'beyond a reasonable doubt'" that the mistake "'did not affect the outcome of the trial'" taking account of the full trial record. *Sherman*, 305 Kan. at 109 (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6). That is, the appellate court must determine if the error deprived the defendant of a fair trial—a constitutional protection rooted both in due process and in the right to trial itself. *Sherman*, 305 Kan. at 98-99, 109.

In his closing argument, the prosecutor pointed out that Hashi and Jama immediately called 911 to report a robbery and had been consistent with their overall descriptions of the incident since then. He cited that as a reason for the jurors to find them

20

credible. To that extent, the argument seems unobjectionable. It is more or less a contrapositive of the old saw that a liar can't keep the details of his or her lie straight in repeated narrations. See *State v. Finley*, 273 Kan. 237, 246, 42 P.3d 723 (2002). But the prosecutor then contrasted Hashi and Jama with Jenkins and Winters. He wove the comparative credibility of the witnesses based on the timing of their versions of the events deeply into his closing argument. He suggested the jurors should disbelieve Jenkins and Winters because they didn't offer an explanation of the events—in particular how Hashi's phone wound up in Winters' car—until "10 months later," meaning during their trial testimony. He then pointed out that Hashi immediately spoke with the police "right when this was happening" and told the jurors "that's why his story is the *more* credible story in this circumstance."

But law enforcement officers informed Jenkins and Winters of their right to remain silent shortly after the events, and they exercised that right. (That factual predicate is undisputed on appeal.) The prosecutor effectively used their decisions then to later attack their credibility in front of the jury. The courts have held that after government agents advise suspects or witnesses of their right against self-incrimination, the prosecution cannot use their silence in declining to answer questions to undermine their trial testimony as a recent fabrication by arguing they had not disclosed their account earlier. *Doyle v. Ohio*, 426 U.S. 610, 617-19, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976) (suspect later charged as defendant); *State v. Kemble*, 291 Kan. 109, 122, 238 P.3d 251 (2010); *State v. Hazley*, 28 Kan. App. 2d 664, Syl. ¶ 2, 19 P.3d 800 (2001) (witness). Doing so is commonly called a *Doyle* violation in recognition of the United States Supreme Court case holding the tactic to be a violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See *Doyle*, 426 U.S. at 619.

In its most corrosive form, a *Doyle* violation entails the prosecutor cross-examining a defendant at trial about why he or she didn't disclose that version of events (or any version, for that matter) during an earlier interview with a law enforcement

21

officer, thereby suggesting silence then demonstrates the trial testimony to be unworthy of belief. See *Doyle*, 426 U.S. at 613-14. But, as the Court pointed out, the silence could just as likely be the product of the law enforcement officer's admonition to the defendant that he or she had the right to decline to answer questions. The Court characterized the circumstance as "insolubly ambiguous" and recognized it would be inherently unfair to burden the exercise of that fundamental right by allowing the prosecution to use the resulting silence to impeach the defendant on cross-examination or to assail his or her credibility in closing argument. 426 U.S. at 614 n.5, 617-18.

Here, Jenkins bases his claim of error solely on the prosecutor's closing argument that traded on an oblique use of Jenkins' and Winters' decisions not to speak with law enforcement officers. The argument, nonetheless, sought to impeach Jenkins and Winters because they exercised their constitutional right to remain silent after being informed of the right. That creates a *Doyle* violation. *Kemble*, 291 Kan. at 121-22; *Hazley*, 28 Kan. App. 2d at 670. It is, in turn, prosecutorial error.

A *Doyle* violation asserted as a ground for reversing a conviction is subject to harmless error review. *State v. Fisher*, 304 Kan. 242, 248, 373 P.3d 781 (2016). A finding of prosecutorial error under the *Sherman* test is similarly reviewed to determine if the defendant's right to a fair trial has been compromised. In *Sherman*, the court, however, also recognized that a prosecutor could be independently sanctioned if an error were heedless or willful and sufficiently egregious to amount to "misconduct." And sanctions would be warranted even if the misconduct did not otherwise deprive the defendant of a fair trial. 305 Kan. at 114-15.

From our vantage point, Jenkins has failed to outline a *Doyle* violation that had a meaningful impact on the jury verdict. The jurors had the opportunity to see the key players testify under oath about what happened and to gauge their responses to cross-examination about their respective versions. Those are the primary tools for assessing

22

credibility. See *State v. Franco*, 49 Kan. App. 2d 924, 936, 319 P.3d 551 (2014). The prosecutor's argument based on the delay in Jenkins and Winters giving their accounts necessarily would have had slight weight in comparison. Moreover, the comments were not directly tied to trial testimony unlike *Doyle*, where the defendant objected both to his cross-examination that highlight a specific interview he had with law enforcement officers during which he declined to offer an exculpatory account and to a portion of the prosecutor's closing argument drawing on the cross-examination. The closing argument here was much more abstract and diffuse and, therefore, lacked the same impermissible punch.[5]

[5]In this case, the prosecutor did not question Jenkins about his contact with the police shortly after the incident. But the prosecutor's cross-examination of Winters did bring out that she had invoked her right not to answer the police investigator's questions and that she had not given an account of the incident until trial. Jenkins' trial lawyer did not object to that line of questioning or the responses. As we have indicated, the prosecutor did not refer to that testimony in his closing argument.

In *Doyle*, the Court left open whether a prosecutor's cross-examination of a witness, other than the defendant, about his or her silence after being advised of the right not to answer questions creates a constitutional error. See 426 U.S. at 616 n.6. In *Hazley*, we found error as to witnesses. 28 Kan. App. 2d at 670. The Kansas Supreme Court has acknowledged the legal determination in *Hazley*. *State v. Wilkerson*, 278 Kan. 147, 157, 91 P.3d 1181 (2004). Without a contemporaneous objection to the cross-examination of Winters, Jenkins could not have premised a freestanding *Doyle* violation on that exchange. See *State v. King*, 288 Kan. 333, 349-50, 204 P.3d 585 (2009). But the substance of the questioning would bear on the potential prejudice of the prosecutor's closing argument. See *Fisher*, 304 Kan. at 248 (harmlessness of *Doyle* violation assessed based on "the record as a whole"); *King*, 288 Kan. at 349 (*Doyle* violation based on prosecutor's closing argument may be considered on appeal absent contemporaneous objection). On appeal, Jenkins has not mentioned, let alone relied on, the cross-examination of Winters. We, therefore, have not done so.

For his second challenge to the prosecutor's remarks to the jury, Jenkins says the same argument effectively shifted the burden of proof from the State to him. To outline the obvious, defendants are presumed innocent in criminal cases, and the State must prove them guilty beyond a reasonable doubt. See *Taylor v. Kentucky*, 436 U.S. 478, 485-

23

86, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978) (presumption and burden); *Miller v. State*, 298 Kan. 921, Syl. ¶ 5, 318 P.3d 155 (2014) (State's burden). Defendants have no obligation to present evidence and carry no burden of proof. The State's obligation implicates a defendant's constitutionally protected due process rights. *Taylor*, 436 U.S. at 485-86; *State v. Switzer*, 244 Kan. 449, 450, 769 P.2d 645 (1989). Just as obvious, a prosecutor may not misstate the law in making a closing argument to jurors. See *State v. Tahah*, 302 Kan. 783, 791, 358 P.3d 819 (2015), *cert. denied* 136 S. Ct. 1218 (2016); *State v. Huddleston*, 298 Kan. 941, 953, 318 P.3d 140 (2014). So a prosecutor may not suggest to a jury that the accused has an obligation to present some evidence of his or her innocence, let alone to prove innocence. *State v. Pribble*, 304 Kan. 824, 837, 375 P.3d 966 (2016).

As we have already said, the prosecutor's argument was flawed. But the flaws do not include some shift in the burden of proof from the State to Jenkins. The comments did not suggest Jenkins had some obligation to come forward with evidence or that he had failed to cross some evidentiary threshold with his evidence. Rather, the pitch attacked the quality of the evidence Jenkins did produce as unworthy—albeit with an impermissible legal argument. A prosecutor does not engage in burden-shifting by pointing out reasons a defendant's evidence should be disbelieved. *State v. Duong*, 292 Kan. 824, 832-33, 257 P.3d 309 (2011). So there was no burden-shift here.

Finally, Jenkins says the prosecutor improperly expressed a personal opinion about the credibility of witnesses. Lawyers generally (and prosecutors particularly) cannot offer their personal views about the credibility of witnesses in making closing arguments to a jury. See *State v. Bridges*, 297 Kan. 989, 1013, 306 P.3d 244 (2013); *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000).

Here, during part of his closing argument, the prosecutor told the jurors:

24

"Again, you have the testimony, not only of the victim in this case that it was taken by force from him, but also the eye witness, Mr. Jama, who said—and even the third person that the defense came up with, who said he was in that car. Which, the State—that's 10-months later that that came up.

"So, *the State has some question about the truthfulness in that regard, too.*" (Emphasis added.)

The comment fairly amounts to an expression of opinion about the veracity of some of the trial testimony. The prosecutor's use of "the State" didn't change the character of the comment. In a criminal case, the prosecutor is the legal representative of the State, which otherwise appears only as a disembodied presence, so the phrase amounts to the linguistic equivalent of a first-person reference. See *State v. Pabst*, 268 Kan. 501, 506, 996 P.2d 321 (2000). The statement here also passed judgment on "the truthfulness" of certain testimony. The comment, therefore, was error.

We cannot say the miscue had any discernible adverse impact on Jenkins' defense. First, the comment was both brief and cryptic. This was not a case in which the prosecutor offered a scorecard review of his personal opinion of the witnesses' credibility or personally disparaged the defendant's veracity over and over again. See *State v. Elnicki*, 279 Kan. 47, 67, 105 P.3d 1222 (2005); *Pabst*, 268 Kan. at 506. From the remark, it's hard to tell exactly what the prosecutor was talking about. He appeared to be suggesting he believed a portion of Omar's testimony was of doubtful credibility. Given the fleeting nature and inexactness of the comment and Omar's secondary role in the underlying events, we readily conclude the remark, though error, played no part in the verdict.

We are unpersuaded that the prosecutor's closing argument deprived Jenkins of a fair trial.

25

*Cumulative Error*

For his final point, Jenkins contends cumulative error deprived him of a fair trial. Appellate courts will weigh the collective impact of trial errors and may grant relief if the overall result of the imperfections deprives the defendant of a fair hearing even when the errors considered individually could be considered harmless. *State v. Smith-Parker*, 301 Kan. 132, 167-68, 340 P.3d 485 (2014). An appellate court looks at the entire trial record to assess the aggregate effect of multiple trial errors. 301 Kan. at 168.

We have identified only two errors: Those in the prosecutor's closing argument. Although the *Doyle* violation is troubling by its very existence—a prosecutor should refrain from that sort of argument—we could not say it somehow tipped the scales in this case from not guilty to guilty. In turn, we found the prosecutor's comment asserting the State's "question about . . . truthfulness" to be without meaningful impact on the outcome. In combination, the two errors didn't make a difference in the verdict. In short, they had no increased cumulative effect averse to Jenkins.

Affirmed.

\* \* \*

MALONE, J., concurring. I concur in the result.

26