NOT DESIGNATED FOR PUBLICATION

No. 121,770

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DANIEL ROMAN MUNOZ,
*Appellant*.


MEMORANDUM OPINION

Appeal from Shawnee District Court; C. WILLIAM OSSMANN, judge. Opinion filed January 14, 2022. Affirmed in part, reversed in part, sentences vacated, and case remanded with directions.

*Carol Longenecker Schmidt*, of Kansas Appellate Defender Office, for appellant.

*Michael J. Duenes*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before BUSER, P.J., POWELL and HURST, JJ.

BUSER, J.:  Daniel Roman Munoz appeals his convictions and sentences for second-degree murder, attempted second-degree murder, criminal possession of a firearm, and theft. He raises several claims of error. Munoz contends his convictions should be reversed because the district court (1) improperly admitted hearsay statements made by the murder victim; (2) improperly admitted jail recordings of conversations Munoz had with his mother; (3) did not give a limiting instruction regarding K.S.A. 60-455 evidence; (4) did not obtain a jury trial waiver from Munoz regarding his stipulation to the charge of criminal possession of a firearm; and (5) made cumulative errors warranting a new trial.

Regarding sentencing, Munoz asserts the district court erred by (1) considering his prior conviction for criminal threat at sentencing; (2) failing to consider his financial resources when imposing Board of Indigents' Defense Services (BIDS) attorney fees; and (3) violating his constitutional rights by considering his prior convictions at sentencing without first presenting them to a jury.

After a thorough review of the issues presented, we affirm the convictions for second-degree murder, attempted second-degree murder, and theft; reverse and remand the conviction for criminal possession of a firearm; vacate the sentences imposed, and remand for further proceedings consistent with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

On June 9, 2018, at about 8 a.m., Topeka Police Department officers responded to a 911 call regarding a shooting at a residence in Topeka. Upon arrival, officers found Pierce Ragsdale lying in a nearby alley with gunshot wounds. After calling an ambulance, the officers spoke with Armando Munoz, who lived at the address with his wife, Marita Veasey, and son, Daniel Munoz. Armando told the officers he was asleep in his house when he was awakened by the sound of gunshots. Armando said he went to the window and saw his son, Munoz, firing a gun at two people he did not know, then chasing them down the alley while firing the gun. Sergeant Vidal Campos transported Armando to the police station, where the officer recorded Armando's statement in writing at Armando's request. When the office read the statement back to Armando, Armando stated, "Yes," that the statements he provided were true, and then he signed the written statement.

About the time of the shooting, Nikki England was driving home in the 400 block of SE Lafayette, when she observed an individual—later identified as Ramon Mathews—running out of the alley in a panic towards her car. England could see blood on Mathews'

2

shirt and she thought he was injured by the way he was running. England and her passenger tried to get Mathews into the back seat of her car, but he ran past her.

As England reversed her car to catch up with Mathews, she observed a man run out of the alley and get inside a neutral-colored sedan. She recognized this individual as Munoz, a man she had known for several years.

England convinced Mathews to get into her car so she could take him to the hospital. On the way there, England asked Mathews several times, "Who did this to you?" At first Mathews responded that it was "my Homeboy," but later, as he was losing consciousness, he said that it was "Lonely." According to England, Lonely was the street name for Munoz. England took Mathews to the hospital, where he underwent surgery for gunshot wounds to his upper body. Mathews died about six days later.

About an hour after the shootings, Munoz returned home and was arrested. During a search incident to his arrest, officers found a set of car keys in his pocket. That afternoon a neighbor, Amber Correa, called the police to report an unfamiliar Toyota Camry parked in her neighbor's driveway with a handgun visible in the center console. According to Correa, she noticed the Camry in the driveway about 9:30 a.m. and had seen Munoz driving the Camry the day prior to the shootings before parking it in the driveway at midnight. Officers learned the vehicle had been reported stolen on the day before the shootings. The car keys seized from Munoz during his arrest unlocked the doors to the Camry.

The firearm found inside the Camry, a Smith and Wesson 9mm handgun, was seized. Forensic firearm testing by James Stevens, an examiner for the Kansas Bureau of Investigation (KBI) identified the weapon as the handgun which fired a bullet collected at the crime scene, and shell casings which were fired from the handgun which were also found in the alley where the shootings occurred.

3

The State originally charged Munoz with two counts of attempted first-degree murder and one count of criminal possession of a firearm. After Mathews died, the State amended the complaint to upgrade one of the attempted murder charges to first-degree murder and added a charge for the theft of the Camry. The State later obtained a grand jury indictment and substituted the indictment for the complaint.

The jury trial began on December 10, 2018. Armando testified in the State's case-in-chief at trial. According to Armando, he was in bed asleep on the morning of June 9, 2018, when he heard gunshots outside. Armando looked outside but could not see anything, so he went out to the alley where he saw "two guys laying there." Armando said he did not know what he told the police when they arrived after the incident because he was drunk and "on [his] way to a hangover." When asked if he told the officers he was drunk, Armando said, "They could see me. They know what they doing. They know their job. They can tell if a man is drunk or not."

The prosecutor presented Armando with a written statement containing his signature and the document was admitted in evidence. Armando denied telling the police he saw Munoz shooting a handgun but acknowledged signing the statement. He testified, "I must have signed it and I didn't know I signed it until now." Armando could not recall if he went to the police station or where he had signed the statement. When asked if anyone had told him to change what he saw the day the of shooting, Armando responded, "Why would they do that?" and "That's a stupid question." He denied having been asked to change his statement, and again denied having told the officers he saw his son shooting a handgun.

Sergeant Campos testified that he was the supervising officer who responded to the 911 call. According to the Sergeant, he spoke with Armando who informed him that he saw his son, Munoz, shooting at two individuals. At that time, standing a short distance away from Armando, Sergeant Campos did not smell any alcohol, nor did

4

Armando tell him he was drunk. Armando agreed to come down to the police station to complete a written statement. At the station, Sergeant Campos videotaped the interview with Armando. This videotape was admitted in evidence. Sergeant Campos wrote out Armando's statement because Armando "just didn't want to write it. He said he couldn't write." Sergeant Campos then read the statement aloud and had Armando sign it. The statement read:

> "'Mr. Munoz was sleeping in the back bedroom when I heard gunshots, more than five. I looked out the window and saw Daniel, my son, shooting at two people. He saw all three running down the alley. I went outside and saw one person lying in the alley, didn't see anyone after that.'"

Munoz' mother, Marita, also testified at trial. According to Marita, she was awakened by gunshots outside her home. After hearing the gunshots, Marita took her grandchildren, who were asleep inside the home, and left for her daughter's nearby residence. When Marita returned home, the police were there. Marita testified that Armando "had a bad hangover" when she returned to the home. She testified that Armando drank beer every morning and that morning he was irritated "because he wanted a beer." Marita also testified that, after Munoz' arrest, she spoke with him at the jail. This questioning elicited an objection from defense counsel which was overruled by the district court. This evidentiary issue will be addressed in the analysis section.

At the trial, England testified about the colloquy between her and Mathews during the trip to the hospital. Defense counsel renewed his pretrial objection to the admission of this evidence, but the district court admitted it. This evidentiary issue will also be addressed in the analysis section.

Other officers testified on behalf of the State. Officer Brandon Uhlrig, one of the first officers to arrive on scene, testified that Armando approached him and, without

prompting, "immediately stated that his son shot those boys." This conversation was recorded on Uhlrig's Axon body camera and admitted in evidence. Officer James Cuevas testified that he arrived at the hospital after England called 911 while transporting Mathews to the hospital. Officer Cuevas did not speak with Mathews directly but heard him tell medical personnel that he did not know what happened or who shot him.

At the conclusion of the trial, the jury found Munoz guilty of the lesser included offenses of second-degree murder and attempted second-degree murder. He was found guilty as charged of criminal possession of a firearm and theft.

Sentencing was continued so the defense could obtain a psychological evaluation of Munoz for purposes of supporting his motion for a downward durational sentencing departure. The psychological evaluation revealed a diagnosis of "Bipolar I Disorder, Manic, with Psychotic features; Antisocial Personality Disorder, and substance use disorders involving marijuana and other substances." As discussed in the analysis section of this opinion, at sentencing Munoz also asserted assorted errors in his criminal history score.

The district court denied Munoz' departure motion and sentenced him to consecutive sentences of 618 months and 59 months on the murder and attempted murder convictions, respectively, and concurrent sentences of 8 months and 12 months on the criminal possession of a firearm and theft convictions. In addition, the court ordered Munoz to pay BIDS attorney fees of $8,625. The claim of error concerning the district court's order regarding BIDS attorney fees is discussed later.

Munoz timely appealed.

On appeal, Munoz contends that admitting in evidence Mathews' statements to England, which incriminated Munoz, violated the Confrontation Clause of the Sixth Amendment to the United States Constitution. In response, the State asserts that Mathews' comments were not testimonial statements covered by the Confrontation Clause.

Before trial, the State moved to have Mathews declared an unavailable witness and to admit the statements he made to England under the unavailable witness exception of K.S.A. 60-460(d)(3). The State argued that Mathews' statements were nontestimonial because the primary purpose of the conversation was not to gather evidence for a future prosecution. In response, Munoz claimed the statements were testimonial because Mathews should have known the information he provided to England could be used in a police investigation and prosecution.

At the hearing on the motion, England testified she did not know Mathews before the incident. England knew he was "very hurt" because he was bleeding from his chest and she "could see through him." She asked Mathews, "Who did this to you? Who did this to you, man? Who did this?" immediately after he got into her car. Mathews responded with "'my home boy.'" After England called 911, she repeated the same questions. This time, Mathews said, "'Lonely.'" According to England, Lonely was Munoz' street name.

Mathews did not provide any other information, and according to England, he "was having a hard time" answering questions. England testified that she wanted to know who shot Mathews because she "felt that it was probably going to be important in the end" because "[h]e was really hurt." She understood that obtaining that information would be important to report to the police.

7

Upon arrival at the hospital, England parked her car quickly and ran inside, screaming at hospital personnel to help Mathews. Hospital staff went to her car and brought Mathews into the hospital. England promptly left.

After leaving the hospital, England went home to check on her children and then went to her attorney's residence because she "was scared" and "needed help." After conferring with her attorney, England spoke with police officers later in the morning. According to England, she told the officers what had occurred, including Mathews' statements, and that she believed his reference to Lonely was a reference to Munoz.

At the conclusion of the hearing, the trial court found Mathews' statements were nontestimonial and admissible under K.S.A. 60-460(d)(3). The trial court ruled that Mathews' statements "would be admissible in trial under the hearsay exception and would not violate the Court's decision in *Crawford* [*v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)]."

At trial, defense counsel objected to the admission of Mathews' statements as hearsay, which the trial court overruled. Munoz has sufficiently preserved this issue for appeal. See K.S.A. 60-404; *State v. Richard*, 300 Kan. 715, 721, 333 P.3d 179 (2014) (pretrial objection to admission of evidence must be preserved by contemporaneous or continuing objection at trial). At trial, England reprised the testimony she had given previously at the pretrial hearing.

Preliminarily, we identify our standard of review and the relevant Kansas statute pertaining to Mathews' statements. Appellate courts typically review a trial court's determination that hearsay is admissible under a statutory exception for an abuse of discretion. *State v. Coones*, 301 Kan. 64, 80, 339 P.3d 375 (2014). However, appellate courts exercise unlimited review, as in this instance, when an evidentiary ruling

implicates an individual's right to confront witnesses under the Sixth Amendment. *State v. Williams*, 306 Kan. 175, Syl. ¶ 1, 392 P.3d 1267 (2017).

K.S.A. 60-460 requires that hearsay statements be excluded unless the statement qualifies under an exception. The State relied on the exception provided in K.S.A. 60-460(d)(3), which allows the admission of a hearsay statement made by an unavailable declarant "at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort."

Notably, Munoz does not challenge the applicability of K.S.A. 60-460(d)(3). Instead, he focuses solely on the trial court's determination that Mathews' statements were nontestimonial and, therefore, not violative of the Confrontation Clause. As a result, the constitutional question presented on appeal is whether the Confrontation Clause precluded the admission of Mathews' hearsay statements.

Munoz contends that admitting Mathews' statements violated his confrontation rights because the statements were testimonial. Munoz reasons that the primary purpose of England's questioning was to "learn the identity of the shooter, with the goal of aiding in the criminal proceedings." He claims that under the circumstances a reasonable person could conclude the statements would be used later in criminal proceedings because they were made "on the way to the hospital, after the shooting, and not in response to an ongoing emergency," and "were not about [his] condition, but rather about what had occurred." In response, the State emphasizes that Mathews did not make the statements to a law enforcement officer or government official, and the conversation was "brief, informal, and spontaneous."

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . .

9

to be confronted with the witnesses against him." Similarly, a criminal defendant in Kansas has the right to "meet the witness face to face." Kansas Constitution Bill of Rights, § 10. The United States Supreme Court held in *Crawford*, that the Confrontation Clause prohibits "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 53-54.

We begin the analysis with the seminal United States Supreme Court opinion in *Crawford* wherein the Supreme Court clarified that the test for Confrontation Clause challenges turns on whether the hearsay statements were "testimonial." *Crawford*, 541 U.S. at 59. While *Crawford* expressly declined to provide a comprehensive definition of "testimonial," the Court observed that at a minimum the term included "[s]tatements taken by police officers in the course of interrogations" but extended to "'pretrial statements that declarants would reasonably expect to be used prosecutorially'" and "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" 541 U.S. at 51-52.

A few years later, in *Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), the United States Supreme Court revisited *Crawford* in a case involving the admission of statements made by the victim during a 911 call that the defendant hit her. In *Davis*, the Supreme Court again declined to provide a comprehensive definition of "testimonial," but provided a general test:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." 547 U.S. at 822.

10

In applying this test, the Supreme Court noted that unlike *Crawford*, the statements in *Davis* were (1) describing events as they were happening, (2) made during an ongoing emergency, (3) necessary to resolve the present emergency, rather than simply learn what had happened, and (4) "frantic" and "provided over the phone, in an environment that was not tranquil." 547 U.S. at 827. The Supreme Court concluded that the statements made during the 911 call in *Davis* were not testimonial because the "primary purpose was to enable police assistance to meet an ongoing emergency." 547 U.S. at 828.

Several years later, the United States Supreme Court addressed a case sharing similarities to the one on appeal in *Michigan v. Bryant*, 562 U.S. 344, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011). *Bryant* involved statements by a gunshot victim identifying the defendant as the shooter, with the key difference being that the statements were made to the police officers who responded to the 911 call and spoke to the victim. When reviewing whether these statements were testimonial, the Supreme Court examined its prior decisions in *Crawford* and *Davis* and clarified what it means for the primary purpose of an interrogation to be "'to enable police assistance to meet an ongoing emergency.'" *Bryant*, 562 U.S. at 359.

The Court also discussed the victim's "mixed motives" when making statements to the police about an ongoing emergency and opined that a victim's "most likely" purpose in making similar statements would be to end the threat. 562 U.S. at 368. But "that does not necessarily mean that the victim wants or envisions prosecution of the assailant." 562 U.S. at 368. The Court also noted in the alternative that a severely injured victim "may have no purpose at all in answering questions" because the injuries "could be so debilitating as to prevent her from thinking sufficiently clearly to understand whether her statements are for the purpose of addressing an ongoing emergency or for the purpose of future prosecution." 562 U.S. at 368-69. The *Bryant* court went on to hold that the

11

statements were nontestimonial based on an objective evaluation of the circumstances, emphasizing that:

"[t]he existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation. . . . [T]he existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public." 562 U.S. at 370-71 (citing *Davis*, 547 U.S. at 822).

The Supreme Court found an ongoing emergency existed because the facts involved "an armed shooter, whose motive for and location after the shooting were unknown, had mortally wounded [the victim] within a few blocks and a few minutes of the location where the police found [the victim]." 562 U.S. at 374. The Court also determined the objective circumstances showed that the "'primary purpose of the interrogation' was 'to enable police assistance to meet an ongoing emergency.' [The victim's] identification and description of the shooter and the location of the shooting were not testimonial hearsay. [Citation omitted.]" 562 U.S. at 377-78.

Returning to the case on appeal, the State emphasizes that England was not a law enforcement officer, and that Mathews' statements were "brief, informal, and spontaneous,"—i.e., not made during a formal interrogation. The United States Supreme Court and Kansas Supreme Court have declined to categorically exclude statements made to non-law enforcement or government actors from the class of testimonial statements. See *Ohio v. Clark*, 576 U.S. 237, 246, 135 S. Ct. 2173, 192 L. Ed. 2d 306 (2015); *Williams*, 306 Kan. at 198. But the identity of the listener is "'highly relevant' because '[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers.'" *Williams*, 306 Kan. at 194 (quoting *Clark*,

576 U.S. at 249). England was obviously not conducting a formal interview or interrogation as Mathews was grievously wounded in her car traveling to the hospital. She was simply a good Samaritan attempting to render aid to Mathews while trying to ascertain who had shot him. In this way, England's role as a third-party rendering aid in an emergency weighs in favor of the statements being nontestimonial.

Another point of contention between the parties is Mathews' expectation of how his statements would be used, specifically whether "'an objective witness [would] reasonably believe such a statement would later be available for use in the prosecution of a crime[.]'" *State v. Brown*, 285 Kan. 261, 291, 173 P.3d 612 (2007); *Williams*, 306 Kan. at 191. In this regard, Mathews' reluctance to disclose the identity of the shooter to England and his use of monikers to answer England's questions suggests that Mathew's purpose was not to convey essential incriminatory information to aid in the police investigation and prosecution of Munoz.

Munoz asserts that no "ongoing emergency" existed at the time of England's questioning because the shooting had already occurred. This assertion is contrary to the evidence, however, since Mathews had sustained his gunshot wounds only moments before England picked him up from the crime scene and observed the possible assailant get into a car. Mathews was gravely injured, the assailant was unknown, in the vicinity, at large, and presumably armed with a firearm. The Supreme Court in *Bryant* determined that an ongoing emergency existed based on essentially the same circumstances. 562 U.S. at 374. As a result, the fact that England, although not a law enforcement officer, was confronted with an ongoing emergency at the time Mathews identified Munoz as the shooter is "among the most important circumstances" to be considered. See 562 U.S. at 370.

Finally, the *Bryant* court also noted that a victim's medical condition is a relevant consideration in the analysis of whether the statements were testimonial. 562 U.S. at 368-

13

69. On the one hand, statements made by a "severely injured victim" like Mathews may not be sufficiently credible or reliable because the responses to questions may be "simply reflexive." 562 U.S. at 368-69. On the other hand, given Mathews' grievous medical condition, we doubt that a potential future criminal prosecution of Munoz was uppermost on his mind. Moreover, there is no indication that when Mathews responded to England's questions, he intended for his statements to be used in a future criminal prosecution.

In summary, we are persuaded that Mathews' statements were nontestimonial and, therefore, not violative of the Confrontation Clause. An objective witness under these urgent circumstances would not intentionally convey the identity of the assailant with a purpose to provide evidence to facilitate a criminal prosecution. On the other hand, the primary purpose of England's questioning was to identify Mathews' shooter so that she could "'enable police assistance to meet an ongoing emergency'" of an unknown, armed assailant who had just shot Mathews, and was possibly seen at the crime scene, a short distance away. 562 U.S. at 378 (quoting *Davis*, 547 U.S. at 822). We find no constitutional error in the district court's admission of Mathews' statements in evidence at trial.

## ADMISSION OF JAILHOUSE RECORDINGS BETWEEN MUNOZ AND HIS MOTHER

Munoz contends the trial court erred in admitting jailhouse recordings of calls and visits between him and his mother. At trial, defense counsel made a two-part objection. First, defense counsel claimed that because the recordings were made in jail, it suggested that Munoz was necessarily guilty. Second, defense counsel objected because the recordings were more prejudicial than probative. The State responded that the jurors were generally aware that Munoz was being held in jail. As for the jailhouse recordings, the State explained that the recordings went to the weight and credibility of Armando's testimony. The trial court overruled defense counsel's objection and allowed the State to

14

admit the videos of Munoz' conversations with Marita. The recordings were marked as State's Exhibit 91 and 92 and published to the jury.

On appeal, Munoz emphasizes that the recordings were not relevant to prove his consciousness of guilt, and, while minimally probative, were overly prejudicial. Munoz also claims the admission of the recordings was not harmless because the jury gave the recordings "significant consideration" by requesting to view them again, and because of the lack of physical evidence tying him to the shootings.

The State counters that the recordings show Munoz was trying to convince his father to retract his statements to the police because they were extremely damaging to his defense, thus demonstrating his consciousness of guilt. According to the State, even if erroneously admitted, Munoz' statements did not affect the jury's verdicts because of the overwhelming evidence establishing Munoz as the shooter.

The trial court admitted the recordings over Munoz' objection. As a result, he has preserved this issue for appeal. See K.S.A. 60-404; *Richard*, 300 Kan. at 721.

Preliminarily, we consider our standards of review and Kansas law regarding the admissibility of evidence at trial. Admission of evidence involves several legal considerations: determining relevance; identifying and applying legal principles including rules of evidence; and weighing prejudice against probative value. See *State v. Shadden*, 290 Kan. 803, 817-18, 235 P.3d 436 (2010). Depending on the consideration at issue, an appellate court applies different standards of review.

First, a court must determine whether the evidence is relevant. All relevant evidence is admissible unless it is prohibited by statute, constitutional provision, or court decision. See K.S.A. 60-407(f); *Nauheim v. City of Topeka*, 309 Kan. 145, 153, 432 P.3d 647 (2019). K.S.A. 60-401(b) defines relevant evidence as "evidence having any

15

tendency in reason to prove any material fact." See *State v. Lowery*, 308 Kan. 1183, 1226, 427 P.3d 865 (2018). Relevance has two elements: a materiality element and a probative element. See *State v. Miller*, 308 Kan. 1119, 1167, 427 P.3d 907 (2018).

Evidence is material when the fact it supports is in dispute or in issue in the case. *Miller*, 308 Kan. at 1167. The appellate standard of review for materiality is de novo. 308 Kan. at 1166. Evidence is probative if it has any tendency to prove any material fact. 308 Kan. at 1167. Probativity is reviewed for abuse of discretion. 308 Kan. at 1166.

A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018). The party asserting an abuse of discretion bears the burden of showing the court abused its discretion. *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018).

Finally, even if evidence is relevant, a district court has discretion to exclude it where the court finds its probative value is outweighed by its potential for producing undue prejudice. See K.S.A. 60-445. An appellate court reviews any such determination for an abuse of discretion. *Ingham*, 308 Kan. at 1469.

The jailhouse recordings at issue were contained in two exhibits admitted at trial. The following are excerpts from the recordings. State's Exhibit 91 contained two audio recordings. On the first recording Munoz made these statements to his mother:

- That he had "seen [his] lawyer today and was wondering . . . if Dad was gonna call and talk to them. . . . Dad was supposed to tell them I didn't do it."
- "I really need that [because] I can't . . . have him . . . going and saying what he said . . . the first time, then I would be in trouble."

16

- "You gotta let him know that and retract that statement."

On the second recording, Munoz made these statements to his mother:

- "Dad's gotta retract his statement he gave to the D.A. and to the police [because] they . . . have him on video cam and he gave a written statement. He gotta retract his statement."
- "He has to tell them that there was no one there, that I snatched the . . . burner from somebody and took off just like everyone else did. Yes, we gonna tell them . . . how everybody was there and everyone scattered. You gotta do that."

State's Exhibit 92 contained video recordings of several jailhouse visits. During a visit on August 12, 2018, Munoz told his mother:

"[T]ell Dad and let him know that, hey, when that [expletive] happened, that there was a whole bunch of people and everybody just started running, you know what I mean? . . . That's all Dad gotta say. There was a whole bunch of people, my son snatched something from somebody . . . everybody took off running . . . . They say that, I won't have to worry about for real . . . the car. I should get off for that though; I'm tell them someone tried to sell it to me like they did, you know, like someone asked if I wanted to buy one, I took it for a test spin, you know what I mean, didn't even really want it . . . couldn't get it."

And finally, during a visit on November 27, 2018, Munoz told his mother: "My lawyer said my case is weak because Dad identified me. But Dad has to tell them like what he said, that he said it wasn't me. If Dad don't tell them that they're going to [expletive] convict me."

17

The trial court concluded the recordings were admissible in evidence because the statements showed Munoz' consciousness of guilt, relying on *State v. Lippard*, No. 114,588, 2017 WL 3837700, at *5 (Kan. App. 2017) (unpublished opinion).

Munoz argues that the trial court cannot rely on *Lippard* because it is an unpublished opinion. See Supreme Court Rule 7.04(g)(2)(A) (2021 Kan. S. Ct. R. 47) ("An unpublished memorandum opinion . . . is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel[.]") He also disagrees with the Lippard panel's application of *State v. Huddleston*, 298 Kan. 941, 960, 318 P.3d 140 (2014), arguing that "merely attempting to persuade a witness to testify in a certain manner, without more, does not show a defendant's consciousness of guilt."

In *Huddleston*, the defendant was in jail pending trial for a murder allegedly committed by the defendant, her sister, and the defendant's former romantic partner. In letters, the defendant advised her sister how to testify against their codefendant to implicate her as the sole perpetrator. Our Supreme Court agreed with the trial court that the letters were both material and probative—and thus relevant—to the defendant's consciousness of guilt. 298 Kan. at 960-61. Additionally, our Supreme Court found no abuse of discretion in their admission because the probative value of the letters outweighed their prejudicial effect. 298 Kan. at 963-64.

In *Lippard*, the State charged the defendant with multiple sex crimes committed against his minor daughters. In several recorded phone calls made while he was in jail awaiting trial, Lippard urged the victims' grandmother to make sure the victims knew how bad the jail conditions were and that they would never see him again if they testified and he was convicted. The trial court allowed the admission of the recordings because they were evidence of Lippard's consciousness of guilt. On appeal, our court affirmed the convictions based on the *Huddleston* court's recognition that "'Kansas and other state cases have held that evidence demonstrating a defendant's consciousness of guilt can be

18

material to several issues in a criminal case including intent, identity, plan, or other matters.'" *Lippard*, 2017 WL 3837700, at *5 (quoting *Huddleston*, 298 Kan. at 960).

Based on our review, we find that Munoz' jailhouse recordings urging his mother to persuade Armando to retract his incriminating statements were relevant, material, and probative in establishing Munoz' consciousness of guilt. The statements clearly showed that Munoz was aware that his father identified him as the shooter to the police, and these statements, unless retracted, would result in Munoz' convictions in the shootings. The statements also showed that Munoz conjured up a false scenario in which he was merely with a group of people at the shooting scene, innocently obtained the firearm, and unknowingly possessed the stolen car in which the murder weapon was found.

We also find no abuse of discretion in the trial court's finding that the recordings were more probative than prejudicial. Apart from the relevance that the recordings identified Munoz as the shooter, the recordings also corroborated the officers' testimony that Armando identified Munoz as the shooter at the crime scene, and impeached Armando's trial testimony when he retracted his on-scene statements to police that he observed his son shooting a firearm at two individuals. On the other hand, the prejudicial effect was slight given that Munoz' recorded statements to his mother were not threatening but persuasive in tone and did not disclose any evidence of prior crimes or proclivities towards violence. For all these reasons, we find no error.

FAILURE TO GIVE A LIMITING INSTRUCTION REGARDING JAILHOUSE RECORDINGS

Munoz contends the trial court erred in not instructing the jury that his attempt "to persuade his father and mother to [testify] in a certain manner, which amounted to evidence of intimidation of a witness under K.S.A. 2020 Supp. 21-5909(a)" could not be used "to determine Mr. Munoz's general propensity to commit the crimes charged in the present case." For its part, the State argues that "[a]lthough Munoz has not shown that his

19

jailhouse statements present evidence of witness intimidation, . . . the State acknowledges his statements may be evidence of a crime or civil wrong which required a limiting instruction from the district court."

Appellate courts use a multi-step process for analyzing jury instruction challenges:

"When analyzing jury instruction issues, we follow a three-step process: '(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.'" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

Whether a party has preserved a jury instruction issue affects the appellate court's reversibility inquiry at the third step. 307 Kan. at 317. At the second step, appellate courts consider whether the instruction was legally and factually appropriate. 307 Kan. at 318. Appellate courts use unlimited review to determine whether an instruction was legally appropriate. *State v. Johnson*, 304 Kan. 924, 931, 376 P.3d 70 (2016).

Munoz candidly concedes that defense counsel did not request a limiting instruction relating to the jailhouse recordings. This is important because, under the third step, if the challenging party does not object to the lack of a jury instruction below, the appellate court applies a clear error standard, and it will only reverse if an error occurred and the court is firmly convinced that the jury would have reached a different verdict if the instructional error had not occurred. The party claiming a clear error has the burden to demonstrate the necessary prejudice. *McLinn*, 307 Kan. at 318.

Both parties recognize that our Supreme Court held in *State v. Gunby*, 282 Kan. 39, Syl. ¶ 3, 144 P.3d 647 (2006), that when a trial court admits evidence that the

20

defendant committed other crimes, "to avoid error, the district judge must give a limiting instruction informing the jury of the specific purpose for admission."

Because the reversibility inquiry is determinative in this case, we will assume—without deciding—that Munoz has shown error in the failure to give a limiting instruction. The question then becomes, was there clear error?

The extent of Munoz' argument on clear error is that because the jury asked to review the jailhouse recordings again during deliberations, "there is a real possibility that had the district court given a limiting instruction, the jury would have returned a different verdict." This argument is inexplicable. By Munoz' own acknowledgement, he must firmly convince our court that the jury would have reached a different verdict had the presumed instructional error not occurred. *McLinn*, 307 Kan. at 318. Munoz' brief argument is not convincing. Moreover, issues not adequately briefed are considered waived or abandoned. *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019).

As detailed in the Factual and Procedural Background section, there was substantial, competent evidence of Munoz' guilt for the crimes of conviction. Given this wealth of incriminating evidence, we are not firmly convinced that a limiting instruction which informed the jury that the evidence of the jailhouse recordings could not be used "to determine Munoz' general propensity to commit the crimes charged in the present case" would have had any effect on the jury other than to alert the jurors that by attempting to persuade his mother to convince his father to retract his statement to the police, Munoz had committed yet another crime.

We are not firmly convinced that the jury would have reached a different verdict if the presumed instructional error had not occurred.

During trial, Munoz and the State jointly stipulated to an element of the crime of criminal possession of a firearm, as provided in K.S.A. 2018 Supp. 21-6304. The stipulation was read to the jury:

"The following facts have been agreed to by the parties and are to be considered by you as true:

"1.    That within five years proceeding on or about the 9th day of June, 2018, the defendant, Daniel Munoz, had been convicted of a felony other than those specified in subsection (a)(3)(A) of K.S.A. 21-6304, to wit: Shawnee County Case 13CR995. Defendant further stipulates he was not found to be in possession of a firearm in case number 13CR995."

On appeal, Munoz acknowledges that during trial he stipulated to the predicate felony which is an element necessary for conviction under K.S.A. 2018 Supp. 21-6304. For the first time on appeal, however, Munoz contends the trial court was required to obtain a voluntary jury trial waiver from Munoz before accepting his stipulation to an element of this crime.

Recognizing that he failed to preserve this issue for appeal, Munoz asserts our court can review this newly asserted issue for the first time because it presents a purely legal question on proven or admitted facts and it is finally determinative of the case. He also claims that failure to consider the issue would lead to a denial of his fundamental rights. See *State v. Harris*, 311 Kan. 371, 375, 461 P.3d 48 (2020) (recognizing exceptions to the general rule prohibiting consideration of new issues on appeal).

The State counters that Munoz has waived or abandoned this issue by not adequately explaining his failure to raise the issue below. See Supreme Court Rule

6.02(a)(5) (2021 Kan. S. Ct. R. 35); *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018).

We are persuaded that Munoz has the better argument because whether a defendant's stipulation to an element of a charged offense constitutes a knowing and voluntary waiver of the right to a jury trial is a question of law subject to unlimited review. *State v. Johnson*, 310 Kan. 909, 918, 453 P.3d 281 (2019). We will consider the issue.

Although not mentioned in Munoz' appellate brief, the Kansas Supreme Court recently addressed a nearly identical claim in *Johnson*. In that case, the State similarly charged the defendant with criminal possession of a firearm, and he stipulated to the prior felony as an element of the crime. The trial court accepted the stipulation without obtaining a jury trial waiver and instructed the jury about the stipulation during trial. Our Supreme Court unanimously held that accepting the stipulation without a waiver was reversible error because it violated the defendant's right to jury trial. 310 Kan. at 918-19. The *Johnson* court reasoned that

> "[t]he Fifth and Sixth Amendments to the United States Constitution 'entitle [ ] criminal defendant[s] to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt."' And when a defendant stipulates to an element of a crime, the defendant has effectively given up his or her right to a jury trial on that element. [Citations omitted]." 310 Kan. at 918-19.

Because a defendant has a fundamental right to a jury trial on all the elements of the charged crimes, courts may not accept a jury trial waiver "'unless the defendant, after being advised by the court of his right to trial by jury, personally waives his right to trial by jury, either in writing or in open court for the record.'" 310 Kan. at 919 (quoting *State v. Irving*, 216 Kan. 588, 589-90, 533 P.2d 1225 [1975]).

23

The State acknowledges *Johnson* but contends it was wrongly decided. However, our court is duty bound to follow Kansas Supreme Court precedent, absent some indication of a departure from a previous position. See *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). We have no such indication here. *Johnson* is dispositive.

The record does not show that Munoz was advised by the trial court of his right to trial by jury on that element of the crime, or that he personally waived that right either in writing or in open court. We reverse Munoz' conviction for criminal possession of a firearm and remand for further proceedings.

CUMULATIVE ERROR

Munoz asserts that the cumulative effect of the errors claimed on appeal deprived him of a fair trial.

When determining whether cumulative error occurred below, appellate courts review whether the errors substantially prejudiced the defendant and denied the defendant a fair trial given the totality of the circumstances, which by necessity requires review of the entire record and involves unlimited review. *State v. Moyer*, 309 Kan. 268, 287, 434 P.3d 829, *cert. denied*, 140 S. Ct. 135 (2019). In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Hirsh*, 310 Kan. 321, 345-46, 446 P.3d 472 (2019).

When any of the errors being aggregated are constitutional in nature, the constitutional harmless error test applies, and the cumulative effect must be harmless beyond a reasonable doubt. *State v. Robinson*, 306 Kan. 1012, 1034, 399 P.3d 194

24

(2017). The State, as the benefitting party, bears the burden of establishing the errors were harmless. See *State v. Akins*, 298 Kan. 592, 600, 315 P.3d 868 (2014) ("The State bears a higher burden to demonstrate harmlessness when the error is of constitutional magnitude.").

Munoz focuses his cumulative error argument on his evidentiary challenges and the failure to give a limiting instruction relating to the jailhouse recordings, but he has only established that an instructional error may have occurred. We note the trial court also erred by failing to secure a jury trial waiver before accepting Munoz' stipulation to an element of the criminal possession of a firearm charge. However, that error only impacted Munoz' constitutional right and did not affect the quality or quantity of incriminating evidence presented to the jury. We are persuaded that, for this reason, this error should not be included in the cumulative error analysis.

A single error cannot support reversal under the cumulative error doctrine. *State v. Ballou*, 310 Kan. 591, 617, 448 P.3d 479 (2019); see also *State v. Butler*, 307 Kan. 831, 868, 416 P.3d 116 (2018) (citing both no error and single error rules). Because Munoz has shown only one presumed instructional error, we find no merit to his cumulative error argument.

CONSIDERATION OF PRIOR CRIMINAL THREAT CONVICTION AT SENTENCING

Munoz contends for the first time on appeal that the trial court erred during sentencing by including his prior 2009 conviction for criminal threat when calculating his criminal history score. Munoz argues the trial court should have disregarded this prior conviction because the presentence investigation (PSI) report did not show whether the conviction was for intentional or reckless conduct. Depending on the answer to that question, as discussed below, Munoz' prior conviction may be based on an

unconstitutional statutory provision and, as a result, not properly included in his criminal history.

Munoz correctly points out that a defendant may raise a legal challenge to the classification of a prior conviction to lower a criminal history score for the first time on appeal under K.S.A. 2020 Supp. 22-3504(a), which allows a court to "correct an illegal sentence at any time while the defendant is serving such sentence." See *State v. Dickey*, 301 Kan. 1018, 1034, 350 P.3d 1054 (2015). Additionally, a challenge to a criminal history calculation essentially raises a claim that the sentence is illegal because it "does not conform with the applicable statutory provision regarding the term of punishment authorized for the current conviction." 301 Kan. at 1034.

Our court generally has unlimited review over the trial court's classification of prior convictions for criminal history purposes under the revised Kansas Sentencing Guidelines Act (KSGA). However, our Supreme Court recently clarified in *State v. Obregon*, 309 Kan. 1267, 1275, 444 P.3d 331 (2019), that the type of challenge that Munoz raises "is a bit more nuanced because it is the State's burden to prove by a preponderance of the evidence that the defendant committed a crime for which classification is appropriate." As a result, the trial court's findings must be supported by substantial competent evidence. 309 Kan. at 1275 (citing *State v. Hughes*, 290 Kan. 159, 162, 224 P.3d 1149 [2010]).

Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as adequate to support a conclusion. *State v. Doelz*, 309 Kan. 133, 138, 432 P.3d 669 (2019). When the record lacks substantial competent evidence to support a district court's criminal history classification, a remand is necessary to allow the district court to determine the appropriate classification. *Obregon*, 309 Kan. at 1275.

Munoz' argument is predicated on *State v. Boettger*, 310 Kan. 800, 450 P.3d 805 (2019), in which our Supreme Court held that the "reckless disregard" provision of the Kansas criminal threat statute is unconstitutionally overbroad. See K.S.A. 2020 Supp. 21-6810(d)(9) (A prior conviction "that has since been determined unconstitutional by an appellate court shall not be used for criminal history scoring purposes."). According to Munoz, the record is insufficient to determine whether his prior conviction was for intentional or reckless criminal threat because the PSI report does not distinguish between the two.

An identical sentencing challenge arose in *State v. Grant-Adams*, No. 121,833, 2021 WL 2603344 (Kan. App. 2021) (unpublished opinion). For the first time on appeal, the defendant challenged inclusion of a prior criminal threat conviction based on *Boettger* when the trial court calculated his criminal history score. In that case, the PSI report was the only document in the record establishing the conviction. Relying on *Obregon*, the panel concluded there was not substantial evidence to support including the criminal threat conviction and, as a result, vacated the sentence and remanded for resentencing. *Grant-Adams*, 2021 WL 2603344, at *11-12.

Here, the PSI alone does not provide substantial evidence because it only describes Munoz' criminal threat conviction by referring to the statute in effect at the time, K.S.A. 2009 Supp. 21-3419(a)(1). That version of the statute included both intentional and reckless intent language. Importantly, if the conviction was for a reckless criminal threat, *Boettger* would require the trial court to disregard the conviction at sentencing under K.S.A. 2020 Supp. 21-6810(d)(9). As a result, Munoz' criminal history would be reduced in a way favorable to Munoz.

The State bears the burden of proving an offender's criminal history by a preponderance of the evidence, and ordinarily a PSI report satisfies the State's burden without an objection by the defendant. K.S.A. 2020 Supp. 21-6814(b); *Obregon*, 309

27

Kan. at 1275. However, "more is required when the summary does not indicate which version" of an offense a defendant has committed, even when there is no objection. 309 Kan. at 1275. When the record on appeal lacks substantial competent evidence to support a district court's classification of a prior conviction or, as in this case, the inclusion of a prior conviction in an offender's criminal history, a remand is required to allow the district court to determine the propriety of including the prior conviction in the offender's criminal history. See *State v. Ewing*, 310 Kan. 348, 359-60, 446 P.3d 463 (2019); *Obregon*, 309 Kan. at 1275-76.

Although *Ewing* and *Obregon* applied these principles to prior out-of-state convictions, our court has also applied them to the classification of prior Kansas convictions. See *State v. Louis*, 59 Kan. App. 2d 14, 26, 476 P.3d 837 (2020) (considering prior criminal threat conviction), *rev. denied* 313 Kan. 1044 (2021).

Recognizing the insufficiency of the PSI, the State added copies of the amended complaint and plea agreement to the record on appeal to prove that the prior criminal threat conviction was based on intentional, rather than reckless conduct. However, because these documents were not submitted to the trial court, they do not qualify as part of the "entire record" which can be added to the appellate record. See Supreme Court Rule 3.01(a) (2021 Kan. S. Ct. R. 19) ("The entire record consists of: (1) all original papers and exhibits filed in the district court . . . ."); see also *State v. Brownlee*, 302 Kan. 491, 505, 354 P.3d 525 (2015) (documents added to the record on appeal may not be considered because they did not qualify as part of the "'entire record'" eligible for addition to the record). Here, as in *Brownlee*, the documents added to the record on appeal were not among the original papers filed in the district court and, thus, do not qualify as part of the entire record.

Because Munoz' PSI report is lacking the critical information of whether he was convicted of a reckless or intentional criminal threat, the prior conviction was not proven

by substantial competent evidence. Accordingly, the sentences are vacated, and the case is remanded for resentencing. At resentencing, the State will have the burden to prove Munoz' criminal history by a preponderance of the evidence. See K.S.A. 2020 Supp. 21-6814; *Obregon*, 309 Kan. at 1275-76.

Finally, in one paragraph at the conclusion of this issue, Munoz adds that the trial court should also have excluded his 2017 conviction for a Kansas Offender Registration Act (KORA) violation from consideration at sentencing. Munoz claims he was only required to register as a violent offender because of the criminal threat conviction, so if the criminal threat conviction is not included for sentencing purposes under K.S.A. 2020 Supp. 21-6810(d)(9) then the same should hold true for his KORA conviction.

The record, however, refutes Munoz' assertion that he was only subject to KORA because of his 2009 criminal threat conviction. One of the grounds he asserted in the district court in support of his motion for a sentencing departure was that his criminal history overstated his actual criminal record, in part because his "obligation to register stems from a juvenile case that is approximately 15 1/2 years old."

While it may be true that Munoz' 2009 criminal threat conviction required him to register as a violent offender, the record which includes his sentencing motion states that he was already subject to KORA requirements for a prior adjudication. That said, Munoz also provides no authority for his assertion that K.S.A. 2020 Supp. 21-6810(d)(9) should require exclusion of his KORA violation conviction. See *Salary*, 309 Kan. at 481 (issues not adequately briefed are considered waived or abandoned). This related claim is without merit.

At sentencing, the trial court ordered Munoz to pay $8,625 in BIDS attorney fees upon his release from prison and while on post-release supervision. Munoz argues for the first time on appeal that the trial court erred because it did not consider his financial resources and the nature of the burden that paying attorney fees would impose under K.S.A. 22-4513. The State concedes the trial court did not explicitly comply with the statutory requirement and agrees that the appropriate remedy is to vacate that portion of the sentence and remand for reconsideration.

Kansas appellate courts will consider a challenge to the imposition of BIDS fees for the first time on appeal despite a defendant's failure to object below. See *State v. Robinson*, 281 Kan. 538, 543-44, 132 P.3d 934 (2006) ("There is no indication . . . that the defendant must first object to the proposed BIDS fees to draw the sentencing court's attention to those circumstances."). Evaluating a trial court's compliance with K.S.A. 22-4513 requires statutory interpretation, which presents a question of law subject to unlimited review. *State v. Garcia-Garcia*, 309 Kan. 801, 824, 441 P.3d 52 (2019).

K.S.A. 22-4513 governs the imposition of BIDS fees. Subsection (b) provides "[i]n determining the amount and method of payment of [BIDS fees], the court shall take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose." K.S.A. 22-4513(b). In *Garcia-Garcia*, the Kansas Supreme Court recently reaffirmed prior holdings that this statute imposes a mandatory duty on the trial court to consider the defendant's financial resources and the burden the payment would impose "on the record at the time of assessment." 309 Kan. at 824; see also *State v. Drayton*, 285 Kan. 689, 716-18, 175 P.3d 861 (2008) (reversing order to pay BIDS attorney fees of $7,110, when court essentially found the defendant would be unable to pay because he would be imprisoned for 25 years).

As in *Drayton*, the trial court acknowledged that Munoz lacked the financial resources to pay the full amount of the BIDS attorney fees because of his lengthy incarceration, and, as a result, deferred payment until after his release from prison. Yet, the trial court failed to explain on the record how the statutory factors weighed in its decision to impose the full amount of BIDS attorney fees. Accordingly, we vacate the BIDS attorney fees assessment and remand for reconsideration under K.S.A. 22-4513(b).

CONSTITUTIONALITY OF CONSIDERING PRIOR CONVICTIONS AT SENTENCING

Finally, Munoz asserts for the first time on appeal that the trial court violated his rights under section 5 of the Kansas Constitution Bill of Rights by relying on judicial fact-finding of prior convictions at sentencing.

As Munoz acknowledges, our Supreme Court has consistently rejected this claim with regard to the United States Constitution based on the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002).

Munoz asserts for the first time on appeal that the jury trial right guaranteed under section 5 of the Kansas Constitution Bill of Rights provides greater protection than the jury trial right under the Sixth Amendment to the United States Constitution. According to Munoz, the Kansas Constitution preserves a common law right to a jury trial on penalty-enhancing prior conviction findings that existed pre-statehood and therefore the KSGA—which allows judicial finding of prior convictions—violates section 5.

While this appeal was pending, the Kansas Supreme Court definitively rejected this state constitutional claim:

31

"Section 5 of the Kansas Constitution Bill of Rights does not guarantee defendants the right to have a jury determine the existence of sentence-enhancing prior convictions under the revised Kansas Sentencing Guidelines Act (KSGA), K.S.A. 2020 Supp. 21-6801 et seq.; no authority substantiates that defendants had such a jury trial right at common law when our state Constitution was adopted." *State v. Albano*, 313 Kan. 638, Syl. ¶ 4, 487 P.3d 750 (2021).

*Albano* is dispositive of this issue. Accordingly, we find that Munoz' constitutional claim is contrary to our Supreme Court's precedent and is without merit.

Affirmed in part, reversed in part, sentences vacated, and case remanded with directions.